# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3133

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Daniel John Marshall, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 10, 2004
Filed: June 13, 2005

_____

Before MURPHY, HEANEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Daniel John Marshall pleaded guilty to manufacturing and attempting to manufacture five grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The district court[1] concluded that Marshall was not entitled to a reduction under the safety-valve provision and denied his motion for downward departure. Marshall sought a downward departure based on his extraordinary post-offense rehabilitation. The court sentenced him to seventy months'

_____

[1] The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

imprisonment under the United States Sentencing Guidelines. Marshall appeals, arguing that the district court erred in finding that he had manufactured methamphetamine on four occasions and that he was untruthful during his safety-valve interview. Subsequent to oral argument, we directed the parties to provide supplemental briefing on the issues raised by the recent changes in federal sentencing caused by the Supreme Court's decisions in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 125 S. Ct. 738 (2005). We affirm.

## I. *Background*

On January 30, 2002, probation officers searched Amy al-Munasif's residence at 1811 Fourth Avenue Southeast, Cedar Rapids, Iowa, where Marshall lived. The search uncovered methamphetamine, methamphetamine-manufacturing equipment, and ingredients used to manufacture the drug.

Cedar Rapids Police Officer Anthony Robinson interviewed Marshall.[2] During the interview, Marshall admitted that he periodically stayed at al-Munasif's residence, and that all the methamphetamine-manufacturing materials and equipment found in the residence, garage, and vehicle belonged to him. Marshall provided law enforcement officers with a typewritten recipe for manufacturing methamphetamine. He also stated that he obtained the manufacturing materials from co-ops and from local discount stores including Wal-Mart and K-Mart. Marshall informed the officers that they would uncover about 700 pseudoephedrine pills during their search. He stated he possessed the pills in preparation for a "cook" that day.[3]

The district court found that Marshall had admitted to Officer Robinson during his January 30 interview that he performed four prior methamphetamine "cooks." Marshall admitted to manufacturing methamphetamine for the first time about one

---

[2] Marshall voluntarily waived his *Miranda* rights.

[3] Officers found 653 pseudoephedrine tablets in the residence.

month prior—which would have been near the end of December—and had "cooked" one time per week since then. Marshall admitted that he had used about 300 pseudoephedrine pills during each "cook." According to Marshall, he produced about seven grams of methamphetamine at three of the "cooks" and had produced ten grams at one of the "cooks." Marshall further explained that after his last "cook," which had occurred two days prior to the interview, the finished product had been stolen from his vehicle.

In January 2003, Marshall entered into a plea agreement with the government. However, because Marshall would not stipulate to four "cooks," the parties reserved the right to dispute drug quantity at sentencing. Marshall also sought to qualify for a safety-valve reduction pursuant to U.S.S.G. § 5C1.2. In order to meet § 5C1.2 requirements, Marshall was again interviewed by Officer Robinson on June 20, 2003. At that interview, Marshall stated that he had manufactured methamphetamine on only two occasions, instead of his previous statement of four. He also stated that he had used 300 pseudoephedrine pills during the first "cook" and only 250 during the second "cook."

At the sentencing hearing, Marshall claimed that he had "cooked" for the first time only two weeks prior to the January 30 interview, and not a month earlier as he had previously testified. Marshall also stated that methamphetamine was stolen from his vehicle after his first cook, which occurred on January 12 or 13, 2002. Officer Robinson, testifying for the government, stated that Marshall initially told him that he had manufactured methamphetamine on four occasions, but at Marshall's safety-valve interview, he admitted to manufacturing only twice.

In rebuttal, Marshall testified on his own behalf. The court reminded Marshall's counsel that "if [Marshall] takes the stand and [the court] finds he testified untruthfully, he could not only lose his acceptance of responsibility, but have obstruction of justice." After hearing the court's caution, Marshall testified. He stated

that he was under the influence of methamphetamine at the time of the first interview. Consequently, the narcotic diminished his mental capacity and affected his ability to correctly recall facts and respond to questions. Based upon this alleged diminished capacity, Marshall urged the court to find that his first statement—in which he admitted to four prior "cooks"—was inaccurate. On cross-examination, Marshall conceded that it was possible that he may have stated that he had "cooked" methamphetamine four times, but contended adamantly he had only "cooked" twice. Marshall argued that unlike his first interview, he was not under the influence of methamphetamine at his safety-valve interview and was able to provide accurate and truthful information. Marshall admitted to only two prior "cooks" during his safety-valve interview.

The district court rejected Marshall's arguments. The court credited Marshall's first interview and discounted his subsequent safety-valve interview. According to the court, "[b]y the time he got to his safety valve interview, he was trying to minimize his criminal conduct by saying he only cooked two times. I don't find that credible, I do not find he's entitled to the safety valve." The court also denied Marshall's motion for downward departure based on extraordinary post-offense rehabilitation. The district court sentenced Marshall to seventy months' imprisonment and forty-eight months' supervised release.

On appeal, Marshall challenges the district court's findings that he manufactured methamphetamine on four occasions. He also challenges the court's finding that he was not truthful during his safety-valve interview, and, thus, not eligible for a two-level reduction under U.S.S.G. § 5C1.2.

## II. *Discussion*
### A. *Drug-Quantity Determination*

We review the district court's drug-quantity determination for clear error. *United States v. Symonds*, 260 F.3d 934, 936 (8th Cir. 2001). Because of this

deferential standard of review, we will only reverse when the entire record definitely and firmly illustrates that the lower court made a mistake. *United States v. Quintana*, 340 F.3d 700, 702 (8th Cir. 2003) (internal quotations omitted); *United States v. Causor-Serrato*, 234 F.3d 384, 389 (8th Cir. 2000). A court may consider any evidence in its sentencing determination that has sufficient indicia of reliability to support its probable accuracy. *United States v. Exson*, 328 F.3d 456, 461 (8th Cir. 2003) (citations omitted). The government bears the burden of proving drug quantity by a preponderance of the evidence. *United States v. Houston*, 338 F.3d 876, 878 (8th Cir. 2003). Marshall contends that because the record does not support a finding that he was untruthful about the number of times he "cooked" methamphetamine, the district court's drug-quantity determination was in error. We disagree.

In this case, the district court's drug-quantity determination was established through Marshall's preliminary admissions to Officer Robinson. The district court's findings on this issue are essentially a matter of credibility. "It is well established that in sentencing matters a district court's assessment of witness credibility is quintessentially a judgment call and virtually unassailable on appeal." *Quintana*, 340 F.3d at 702 (internal quotations omitted). The district court's reliance on Officer Robinson's testimony was not clearly erroneous.

At the sentencing hearing, Officer Robinson testified for the government that Marshall stated to him that he had performed four prior "cooks." The government also presented Officer Robinson's contemporaneous notes as corroboration of his testimony that Marshall had stated that he had performed four prior "cooks." Marshall's counsel vigorously cross-examined the reliability of Officer Robinson's notes and contended the officer may have been mistaken. The court also heard testimony from Marshall. Marshall conceded that he may have stated he had made four cooks but attributed the statement to confusion resulting from his methamphetamine use. Marshall urged the court to rely instead on his safety-valve interview in which he stipulated to only two prior "cooks." The court credited Officer

Robinson's testimony and found that Marshall had manufactured methamphetamine on four prior occasions. The district court's judgment was not clearly erroneous.

## B. *Safety-Valve Departure*

Next, Marshall argues that the district court erred in refusing to reduce his sentence under the safety-valve provision of U.S.S.G. § 5C1.2. A defendant has the burden of demonstrating that he is entitled to a more lenient sentence, and our review of the district court's conclusion that Marshall did not discharge that burden is for clear error. *United States v. Surratt*, 172 F.3d 559, 566 (8th Cir. 1999).

In order to qualify for safety-valve reduction, a drug defendant must satisfy five requirements. In relevant part, the five requirements are as follows:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines . . . ;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon . . . in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . ; and
> (5) *not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . . .*

U.S.S.G. § 5C1.2 (emphasis added). The only requirement at issue here is whether Marshall truthfully provided to the government, before sentencing, the number of prior "cooks."

As noted above, at sentencing, the government argued that Marshall had not truthfully provided all information and evidence he had concerning the methamphetamine-manufacturing offense before the hearing. The government presented evidence, including Officer Robinson's testimony and interview notes, which supported its contention that Marshall was untruthful at his safety-valve interview and at the hearing. The district court assessed the witnesses' testimony and concluded that Marshall had not been completely truthful at the safety-valve interview because he was trying to minimize his criminal conduct. Based upon the record before us, we cannot say the court's finding is clearly erroneous.

## C. *Booker Error*

Subsequent to oral argument, the Supreme Court handed down its landmark decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), which invalidated a state sentencing guidelines system remarkably similar to the federal system. We suspended our consideration of the case pending the Supreme Court's decision in *United States v. Booker,* 125 S. Ct. 738 (2005), and our own decision in *United States v. Pirani*, No. 03-2871, slip op. (8th Cir. Apr. 29, 2005). We directed the parties to supply supplemental briefing in light of *Booker* which had the effect of rendering the Federal Guidelines system advisory. Based upon *Booker,* Marshall contends that the district court committed plain error by applying the Federal Sentencing Guidelines in a mandatory manner. Marshall argues that the case must be remanded for resentencing.

While it is true that the district court committed error under *Booker* by applying the Federal Sentencing Guidelines as mandatory, it is not true that the error always requires a remand for resentencing. In *Booker*, the Court directed us to apply "ordinary prudential doctrines" such as plain error and harmless error. 125 S. Ct at 769. Marshall acknowledges in his supplemental brief that he made no Sixth Amendment objection below and that "this court should apply a plain error standard of review". Our recent *Pirani* decision clearly sets forth the standard to be applied in this circuit in analyzing Marshall's argument. We apply the traditional plain error factors set forth

-7-

in *United States v. Olano*, 507 U.S. 725 (1993). To show plain error, Marshall must show there is :

> (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Pirani* slip op. at 7 (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)).

We have held that applying the Guidelines in a mandatory manner is error and that the error is plain under *Booker*. *Id*. at 8. The more difficult question for this case is whether the error affected Marshall's substantial rights. "[T]he third *Olano* factor turns on whether *Pirani* has demonstrated a reasonable probability that he would have received a more favorable sentence with the Booker error eliminated." *Id*. at 10. Based upon our review of the record and our applicable precedent, Marshall has not shown a reasonable probability that his sentence would have been more favorable in the absence of mandatory sentencing guidelines.

With respect to the third *Olano* element Marshall argues that because he received a sentence at the bottom of the applicable Guidelines range there is a reasonable probability that his sentence may have been lower had the district court viewed the Guidelines as advisory. In addition, he notes the district court's statement "[t]hat's the very lowest sentence I can give him under the guideline range." This statement, however, was made in response to Marshall's request that he be sentenced at the low end of the Guidelines range.[4] A sentence at the bottom of the Guidelines

---

[4]The following colloquy took place between the court and counsel for Marshall:

range, without more, does not show a reasonable probability that a sentence would have been reduced in the absence of mandatory guidelines. *Id*. at 12; *see also United States v. Light*, No. 04-1849, slip op. at 9 (8th Cir. May 9, 2005) (district court's statement that "my discretion is limited to that 235 to 295" insufficient to demonstrate reasonable probability of a lesser sentence). Marshall argues that "it is certainly reasonable to assume that the district court may have imposed a lower sentence if it had not believed it was required to apply the guidelines sentence." Based upon the holding in *Pirani*, we are not free to assume that the district court would have imposed a lower sentence. Marshall must establish a reasonable probability and he has not done so. While it is not certain the district court would have sentenced him at 70 months under an advisory guidelines system, the court's statement in response to Marshall's request alone is insufficient to make the probability of a more favorable sentence reasonable.

Lastly, Marshall argues that the district court's sentence should be reversed as unreasonable in light of the relevant factors of 18 U.S.C. § 3553(a); *see also Booker*, 125 S. Ct. at 767 (holding that district court sentences are reviewed on appeal for unreasonableness). Of the factors outlined in the statute, Marshall emphasizes his "minimal criminal history." Additionally, he states that although he was convicted of manufacturing methamphetamine, the government did not allege that he did so for

COURT:     I'll hear from the attorneys . . . on where I should sentence [Marshall] within the [guideline] range.

COUNSEL: We would ask the court to sentence . . .Mr. Marshall to the bottom of the guideline range, seventy months.

                                 * * * *

COURT:     I am ready to sentence. It is the judgment of the Court that Daniel John Marshall is hereby committed to the custody of the Bureau of Prisons to be imprisoned for seventy months on Count 1 of the indictment. That's the very lowest I can give him under the guideline range.

purposes other than for his own consumption. Marshall also contends he has reformed his life since his arrest and presents little risk of recidivism. The district court considered these same factors in declining Marshall's downward departure motion. Our review task is not to decide whether we agree with the district court but whether its decision traverses the boundaries of reasonableness. After reviewing the facts of this case in light of § 3553(a), we cannot say the district court's sentence is unreasonable.

Accordingly, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, the district court clearly erred by ignoring Daniel John Marshall's consistent statements that he cooked methamphetamine two times, in favor of Officer Robinson's testimony that he recalled Marshall telling him about a year earlier that he had cooked methamphetamine four times. I would remand this matter for resentencing with application of the safety valve and base offense level of 28.[5]

Robinson interviewed Marshall on January 30, 2002 after Robinson and others searched Amy al-Munasif's house. At that time, Robinson had been on the DEA Drug Task Force for less than a month. Robinson contemporaneously took

---

[5]I concur in the majority's holding that Marshall is not entitled to relief under United States v. Booker, 125 S. Ct 738 (2005). I continue to believe that a defendant's challenge to the factual basis for a sentence enhancement preserves his Sixth Amendment sentencing claim. See United States v. Pirani, 406 F.3d 543, 555-62 (8th Cir. 2005) (en banc) (Heaney, J., dissenting). Moreover, I adhere to the view stated by Judge Bye in Pirani, that defendants who did not properly preserve their Booker claims in the district court are nonetheless generally entitled to resentencing under a constitutional regime. Pirani, 406 F.3d at 562-67. Because a majority of our court held to the contrary on both counts, however, I do not dissent on this basis.

handwritten notes of the encounter and later wrote an official report, both of which are part of the record. His notes contain basic information, such as the method Marshall used to manufacture methamphetamine, and reflect the details of only two cooks. Marshall admitted to Robinson that he recently had been consuming a large amount of methamphetamine. He further related that the methamphetamine manufacturing supplies at the residence were his, and indicated that the officers would find roughly 700 pills of pseudoephedrine.[6] Marshall was not arrested at that time.

Despite the January interview, the government waited nearly nine months before charging Marshall with any federal offense. The reason for the delay is unclear, since Marshall was the sole defendant and no extensive investigation beyond the initial search and interrogation appears to have been completed before charging. By the time he was charged, Marshall had left Iowa, secured a job in South Carolina, and rid himself of his methamphetamine addiction. He was arrested on November 7, 2002, and returned to Iowa.

According to representations made by Marshall's counsel, Marshall sought to dispose of his case as quickly as possible. He admitted to the conduct alleged, but disputed the claim that he cooked methamphetamine four times. Although he entered into a plea agreement, Marshall maintained that he only cooked twice, and altered the plea agreement documents to omit any reference to engaging in four cooks. He pled guilty on January 30, 2003, less than three months after being charged.

Marshall appeared eligible for safety valve relief, so long as he fully debriefed with the government as to the details of his offense. See USSG § 5C1.2(a)(5) (requiring defendant to "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense" in order to qualify for safety

---

[6]Marshall's estimate was correct; officers recovered 653 pseudoephedrine tablets.

valve relief). He met with the government on June 20, 2003. At this hearing, he remained adamant that he only engaged in two cooks, and Robinson remained equally adamant that Marshall admitted to four cooks during their earlier encounter. The government then suggested that Marshall was being untruthful, and recommended that the district court deny safety valve relief.

At sentencing, the government disclosed Robinson's handwritten notes to defense counsel for the first time. These notes do not reflect that Marshall manufactured methamphetamine four times; they particularize only two cooks. Below these details, Robinson had written "4 times before 300 pills apiece." (Appellant's Addendum at 1.) The government argued that this note buttressed Robinson's claim that Marshall cooked four times. Marshall, on the other hand, suggested that the note meant merely that he bought 300 pills of pseudoephedrine on four different occasions.

The district court sided with the government, which resulted in a much higher sentence for Marshall. Since it found Marshall not truthful, he was ineligible for the two-level safety valve reduction. See USSG §§ 2D1.1(b)(6), 5C1.2(a) (mandating two-level reduction in offense level for drug defendants who, inter alia, truthfully debrief on their offenses of conviction). Applying a base offense level of 30 and other adjustments, Marshall was left with a sentencing range of 70 to 87 months, as opposed to a range of 46 to 57 months, which would have applied if the court had credited Marshall's testimony.

Although I recognize that we typically defer to a district court's decisions on the veracity of witnesses, United States v. Tucker, 243 F.3d 499, 506 (8th Cir. 2001), such deference is based on the principle that the district court is in the best position to make such determinations, United States v. Mendoza-Gonzalez, 363 F.3d 788, 794 (8th Cir. 2004). Here, the district court's statement of reasons indicate that it disbelieved Marshall based on its hunch that Marshall was attempting to mitigate his

-12-

culpability: "I credit his first statement to law enforcement on January 30, 2002, during which he said he cooked methamphetamine four times. By the time he got to his safety valve interview, he was trying to minimize his criminal conduct by saying he only cooked two times." (Sent. Tr. Vol. II at 98-99.)

The district court opined that Marshall initially told Robinson he cooked four times, and then later changed his story when he realized that four instances of manufacturing would result in a more severe sentence than two because of the higher yield. For a defendant with a GED, no record of legal training, and no prior federal offenses, it is an unwarranted leap of faith to assume he recognized that United States Sentencing Guideline section 2D1.1, which applies to violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii), and 846 (Marshall's offense of conviction), calls for a base offense level of 30 for offenses involving 35 to 50 grams of actual methamphetamine (the range if Marshall cooked four batches), and a base offense level of only 28 for those involving 20 to 35 grams of actual methamphetamine (the range if Marshall cooked two batches).[7] While one could certainly speculate that Marshall educated himself about the sentencing guidelines through conversations with counsel, the record does not support such conjecture. Marshall has insisted that he only cooked twice since the time of his initial meeting with his lawyer in the fall of 2002, well before his safety valve interview the following June.

Although the majority suggests that the district court was forced to make a decision to believe one side of two conflicting accounts, that was simply not the case. This is not a case in which we are presented with hard evidence that contradicts the

---

[7]If Marshall did possess such extensive knowledge of the sentencing guidelines and was indeed changing his story to avail himself of the most lenient sentence, one would certainly expect him to recognize that if he simply agreed at the safety valve interview that he cooked four batches of methamphetamine, he would have been sentenced within a range two levels lower than what he actually received on account of the application of the safety valve. See USSG §§ 2D1.1(b)(6), 5C1.2(a).

defendant's claim.  The only apparent conflict concerns Marshall's own statements: whether the district court would believe what Robinson claims Marshall said on January 30, 2002, or whether it would believe what Marshall has consistently maintained to be the truth.

Robinson's notes detail only two instances of manufacturing.  Marshall indicated he used about 550 pseudoephedrine pills altogether–250 one time and 300 another, and officers found roughly 650 unused pills that Marshall agreed were his, for a grand total of 1200 pills.  In this context, it is likely that the reference in Robinson's notes to "4 times 300 pills apiece" meant that Marshall had bought 300 pseudoephedrine pills on four occasions, for a total of 1200 pills.  Robinson, however, maintained that despite the fact that Marshall's interpretation was consistent with the accounting of pills used and unused, Marshall told him he manufactured methamphetamine on four occasions.

When Marshall was asked at sentencing about the apparent conflict between Robinson's recollection and his own, he stated that if he indeed told Robinson he cooked four times, he misspoke.  Marshall was struggling with a serious methamphetamine addiction, and was under the influence of the drug when Robinson questioned him.  Given that, he agreed that it was entirely conceivable that he mistakenly told Robinson he cooked four times, or that Robinson either did not hear him correctly or misunderstood him.  What is less plausible, however, is that Marshall actually *did* cook four times rather than two.  Marshall was unequivocal that he only manufactured methamphetamine twice, and his testimony to that effect should have been credited.  I would reverse the district court and remand for resentencing.

_____