# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1350
_____

United States of America

*Plaintiff - Appellee*

v.

Nicholas Krug

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Harrison

_____

Submitted: January 11, 2016
Filed: May 4, 2016
[Published]

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

PER CURIAM.

Nicholas Krug and a co-defendant, Charles Edward Elliot, together operated
a Ponzi scheme. After a jury trial, Krug was convicted of conspiracy to commit wire

fraud, in violation of 18 U.S.C. §§ 1343 and 1349. The district court[1] sentenced him to 42 months' imprisonment and 3 years of supervised release. Krug appeals, alleging that there was insufficient evidence for the jury to conclude that he intentionally participated in a conspiracy to commit wire fraud, and that the district court erroneously denied his motion to proceed pro se and represent himself at trial.

## I. Background

Krug was an officer of Sovereign International LLC, a Nevada corporation that Krug and Elliot used to effectuate a Ponzi scheme from March 2007 until August 2012. One of the victims of the scheme was Ruthann Currence, a resident of Monterey, California. Unsatisfied with her efforts to protect her and her husband's assets, she received advice from a friend, Charles Moreno, to establish a limited partnership with Elliot and Krug in Mountain Home, Arkansas. Currence contacted Elliot by phone, and he apparently earned her trust over the course of several calls. During their conversations, Elliot represented to Currence that he facilitated investments through his business, Sovereign International, and had 11 years' experience with his company. He eventually offered Currence the opportunity to become an investor, telling Currence that her money would be protected by a U.S. government bond. He stated that if Currence were to invest $500,000, she would receive dividends of $50,000 per month for one year. At the end of the 1-year term, Currence would have the option to either receive her $500,000 principal investment back, or reinvest it for another 1-year term. In any case, Elliot required a minimum investment amount of $300,000 to participate.

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Relying on the promises and representations Elliot made to her, Currence, on or about March 29, 2007, wired $500,000[2] from Bank of America in Monterey, California, to Sovereign International's bank account in Las Vegas, Nevada. To obtain the investment money, Currence mortgaged her home, which had previously been paid for in full.

On or about March 30, 2007, Krug drew on the same Sovereign International account for a $50,000 check which he endorsed, dated March 29, 2007, and deposited into a bank account for Krug International, another Krug/Elliot entity, at Bank of America. The money was derived almost completely from Currence's investment money, since prior to the transfer, the Sovereign International bank account had a balance of $201.26. Elliot and Krug also used the money from Currence to issue dividend checks to other individuals who had previously invested with them. From about March 29, 2007, to about April 19, 2007, those checks, totaling approximately $75,000, were also drawn on the Sovereign International bank account where Currence had wired her $500,000.

When Currence did not receive her first dividend check promptly, she inquired with Elliot as to her check. On May 15, 2007, approximately 45 days after investing, Currence received a $50,000 check from Elliot and Krug. When she did not receive any subsequent checks, however, she made numerous calls to Elliot to inquire about her additional monthly interest payments. Currence did not receive any money for about a year, and Elliot provided her with various excuses. On April 30, 2008, Currence received a second check from Elliot and Krug, but only in the amount of $2,000. That check was drawn on a Bank of America account belonging to Divine Resources, LLC, another company associated with Elliot and Krug.

---

[2]Currence's investment came from assets she owned jointly with her husband, and her husband was also included in some of the communications with Krug and Elliot.

The $2,000 was not enough to allow Currence to pay her mortgage. When she explained that she would lose her home if she did not receive her dividends, Elliot and Krug sent a third check on May 30, 2008, for $4,000. That check was drawn on the same Divine Resources account.

After Currence received the third check, Elliot began ignoring her attempts to reach him. She then began correspondence with Krug, by email and by phone, between June 2009 and August 2012. Throughout that time period, Krug sent Currence numerous emails that included false and fraudulent statements, misrepresentations, and empty promises regarding the status of her investment funds and the payment of interest and repayment of principal on the invested funds. The emails served to lull Currence into a false sense of security, postpone inquiries and complaints, and in general conceal the fraud that Elliot and Krug were perpetrating.

At one point, Currence complained to her friend Moreno, who had referred her to Elliot. Moreno told her the money she had received was "other people's money."[3] Currence then asked Krug where the money from her dividend payments originated, and Krug told her it was not "other people's money," that the check came from other trades, and that her $500,000 was invested in the Deutsche Bank in Switzerland.

_____

[3]It is clear that Elliot and Krug used Currence's money to pay previous investors and themselves, and then used "other people's money" to provide dividend checks to Currence. Another investor, Rose DeVaul, provided Krug and Elliot with $100,000 in April 2007. The investment terms were similar to Currence's agreement. Prior to the deposit of the $100,000, Sovereign International's bank account had a $9,232.23 balance. From April 2007 until the end of July 2007, Elliot and Krug issued checks drawn on that account to previous investors. The checks totaled approximately $70,000 during that time period, and one of the checks, dated May 15, 2007, was issued to Currence for $50,000. DeVaul herself only ever received one dividend check from Elliot and Krug, in the amount of $5,000.

-4-

Currence eventually contacted the Arkansas Securities Department in Little Rock, Arkansas. She was told that Elliot and Krug were already the subject of an ongoing investigation with the Arkansas Securities Department. Currence provided the Securities Department with documentation and recorded phone calls, and the Department then contacted the FBI, which initiated an investigation.

Krug was charged with one count of conspiracy to commit wire fraud. At a hearing on April 14, 2014, Krug informed the district court[4] that he wanted to waive his right to appointed counsel and proceed pro se. The court engaged in a colloquy with Krug in order to ensure he was "fully aware of the dangers and risks associated with self-representation." Yet "Krug was persistently evasive and refused to directly answer the Court's questions. Because of his obstructive behavior, the Court denied his request to proceed pro se" on April 15, 2014.

On August 8, 2014, Krug's case was reassigned to the Honorable Timothy L. Brooks. On September 26, 2014, Krug filed another motion to proceed pro se. Judge Brooks first analyzed Krug's conduct at the previous hearing, where the colloquy consisted of a series of questions regarding his ability to represent himself and where Krug was informed that he faced up to 20 years in prison if convicted. When Judge Holmes inquired if Krug understood the requirements of proceeding pro se, however, Krug did not answer affirmatively. He instead responded that he would "represent the corporate entity that you are—as a third party intervenor." Judge Brooks reiterated Judge Holmes' finding that Krug's refusal to answer was obstructionist. The court also considered Krug's behavior in the ensuing months between the first and second hearings. During that time, Krug mailed documents to the court that the district court concluded were irrelevant and nonsensical.

---

[4]The Honorable P.K. Holmes, III, Chief United States District Judge for the Western District of Arkansas.

One of these mailings was entitled his "Affidavit of Truth Notice of Conditional Acceptance of Offer Upon Proof of Claim," which Krug prepared pro se. The district court described the Affidavit as an "attempt[] to piece together legal language from various sources that are inapplicable to his criminal case." Krug referred to himself as 'Nicholas Krug, a Real, living man, a Party in Interest (hereafter Affiant), as sui juris, ex rel, the only Authorized Representative for Nicholas Krug, who is neutral in public, who is unschooled in law, and making a special appearance, but not appearing generally, before this court as a Third Party Intervener, under the supplemental rules of Admiralty, Rule E(8) . . . ." Based in part on these mailings, the court concluded that Krug did not understand the rules and legal proceedings such that he could represent himself at trial.

The district court also concluded that Krug failed to recognize the authority of the court to preside over his case, as evidenced by a pro se mailing in which he stated "The alleged Plaintiff, United States of America, and also the U.S. District Court Western District of Arkansas . . . has no jurisdiction or valid contract to proceed against Affiant, thereby enacting a default judgment in commerce." The court found that Krug had not identified any change in circumstances that would alter the analysis of whether he could proceed pro se, especially considering the trial was set to begin within two weeks, and therefore denied Krug's motion. Krug was represented by counsel at trial and ultimately convicted. Krug now challenges the sufficiency of the evidence and the denial of his motion to represent himself at trial. We have jurisdiction pursuant to 28 U.S.C. § 1291, and finding no error, we affirm.

## II. Sufficiency of the Evidence

Krug alleges that there was insufficient evidence for his conviction because there was no evidence to show he intentionally participated in the conspiracy. We review a claim of insufficient evidence to support a guilty verdict de novo, viewing "the evidence in the light most favorable to the jury's verdict, drawing all reasonable

inferences in favor of the verdict, and reversing 'only where no reasonable jury could find all the elements beyond a reasonable doubt.'" United States v. Cole, 721 F.3d 1016, 1021 (8th Cir. 2013) (quoting United States v. Louper-Morris, 672 F.3d 539, 555 (8th Cir. 2012)).

To sustain Krug's conviction, the government was required "to prove: (1) there was an agreement between two or more persons to commit . . . wire fraud, (2) [Krug] knew of the agreement, and (3) [Krug] intentionally joined the agreement." Id. at 1021 (citing Louper-Morris, 672 F.3d at 555).

Krug's sufficiency argument hinges on the fact that he did not have direct contact with Currence during the preliminary investment discussions she had with Elliot. He therefore alleges that he did not have specific knowledge of the misrepresentations Elliot made to her. However, "[p]roof of a defendant's involvement in a conspiracy may . . . be demonstrated by direct or circumstantial evidence." Cole, 721 F.3d at 1022 (quoting United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc)).

There were numerous pieces of evidence supporting Krug's intentional involvement in the scheme. Elliot and Krug both signed the "Joint Venture Agreement" that contained the terms of Currence's investment with Sovereign International and was sent to Currence. Krug and Elliot were also both signatories and account holders for the Sovereign International bank account where Currence wired her $500,000. After receiving Currence's money, Krug endorsed a check cut from Sovereign International's account and deposited it into Krug International's account at Bank of America. Elliot and Krug were both signatories on that account as well. Krug and Elliot both signed all of the checks sent to Currence, drawn on accounts for which Elliot and Krug were both account holders and signatories.

Also incriminating were the recorded conversations between Krug and Currence that Currence eventually sent to the Arkansas Securities Department. In them, Krug stated that Currence's "interest check" had come from a trade and that they would not be able to give her entire investment back within the year. Krug told Currence that her money was invested in Switzerland, and sent emails making false promises and misrepresentations to Currence regarding the status of her invested funds and the interest payments she was promised. Viewed in the light most favorable to the jury's verdict, with all reasonable inferences drawn in favor of the verdict, the evidence was sufficient to prove that Krug intentionally participated in the agreement to defraud investors.

Krug makes an additional argument that he did not have the requisite intent to defraud Currence. "Intent is an essential element of" wire fraud, but "[f]raudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions." United States v. Flynn, 196 F.3d 927, 929 (8th Cir. 1999) (citations omitted). Krug made misrepresentations to Currence about where her money was and where the interest payments came from. Even if Krug's theory that his misrepresentations were innocent and unknowing were consistent with the evidence, the government's theory that Krug had the requisite intent also was consistent with the evidence. Where "[b]oth theories are consistent with the evidence presented . . . we will not upset the jury's verdict." Id. at 930. "The government's evidence need not exclude every theory except guilt in order for a jury to find a defendant guilty," and the evidence was sufficient to support the verdict here. Id. at 929.

### III. Right to Proceed Pro Se

Krug alleges that the district court erred in denying his motion to proceed pro se. We review the district court's decision de novo. United States v. Mosley, 607 F.3d 555, 558 (8th Cir. 2010) (citing United States v. Mahasin, 442 F.3d 687, 691

(8th Cir. 2006)). The Sixth Amendment grants a defendant the right to self-representation, Faretta v. California, 422 U.S. 806, 819–20 (1975), but that right is not absolute. United States v. Edelmann, 458 F.3d 791, 808 (8th Cir. 2006). The defendant must understand the consequences of proceeding pro se and be competent to stand trial as evidenced by an understanding of the nature of the legal proceedings against him. See United States v. Turner, 644 F.3d 713, 720–21 (8th Cir. 2011). Moreover, the right to self-representation may be denied or terminated "when the defendant engages in serious obstructionist misconduct." United States v. Mosley, 607 F.3d 555, 558 (8th Cir. 2010) (citations omitted). The "government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer," Martinez v. Court of Appeal of Cal., 528 U.S. 152, 162 (2000), and a "defendant is not entitled to use the right of self-representation 'as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.'" Mosley, 607 F.3d at 558 (quoting Edelmann, 458 F.3d at 808–09).

We conclude that the reasoning of the district court was sufficient to support its decision on self-representation. The district court found that Krug refused to directly answer questions during the colloquy, and that he did not affirmatively answer when asked if he understood the charges against him and the serious consequences that could result from a guilty verdict. For example, when asked if he understood that he would have to follow the court's rules during trial, Krug simply said: "Sir, again, I'm here as a third-party intervenor for that corporate entity that you have that you're trying to get me to agree that I am. I am the owner of that name. I am not that entity that you're referring to." He also refused to answer when the court, after explaining the potential risks of self-representation, inquired whether he still wanted to represent himself. The district court fairly viewed such behavior as obstructionist, because it directly interfered with its ability to determine whether Krug could provide a knowing and voluntary waiver of his right to counsel. Moreover, Krug's subsequent behavior and mailings to the court bolstered the district court's

decision on self-representation, since his arguments were either unintelligible or irrelevant to his case, and they expressly rejected the jurisdiction of the court where his trial would be held. Under these circumstances, the district court was unable to determine that Krug's attempted waiver of his right to counsel was knowing and voluntary, and therefore did not err in denying Krug's motion to proceed pro se. <u>See</u> <u>Mosley</u>, 607 F.3d at 559.

## IV. Conclusion

We affirm the judgment of the district court.

_____