**UNITED STATES of America, Appellee,**

v.

**William C. LaCHAPELLE, Appellant.**

**No. 91–3103.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 12, 1992.

Decided July 8, 1992.

Robert Sicoli, Minneapolis, Minn., argued, for appellant.

Jeanne Graham, Asst. U.S. Atty., Minneapolis, Minn., argued, for appellee.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

William LaChapelle appeals his conviction for receiving child pornography through the mail in violation of 18 U.S.C. § 2252(a)(2). We affirm.

## FACTS [1]

As part of an ongoing investigation into child pornography, the government obtained a pornography distributor's mailing list, which contained the names of 5,700 active customers who had ordered materials from the distributor. According to the distributor, approximately fifty of its customers were interested in child pornography and roughly forty percent of its revenues were derived from a section of their catalogue entitled "Girlie Watcher Series," which advertised videos such as "Schoolgirl Teaser" and "Teenage Lust Stories." Based on these facts, a United States Cus-

---

1. Because LaChapelle appeals from a verdict against him, we consider the facts in the light most favorable to the government. *See United States v. French,* 683 F.2d 1189, 1192 (8th Cir. 1982) (citations omitted).

toms Special Agent decided to use the distributor's mailing list for a child pornography sting operation.

The agent began the operation by developing a flier advertising that Artiste Internationale, a Belgium company, could supply "extremely hard to obtain erotica." Using its mailing list, the agent distributed the Artiste Internationale flier to the pornography distributor's 5,700 customers. Approximately 1,800 of the customers responded to the flier's invitation to request more information, 300 of which specifically requested information on child pornography.[2] The agent then mailed a government-created catalogue to the 300 individuals who expressed an interest in child pornography, and 160 individuals responded to this solicitation and ordered child pornography.

As for William LaChapelle, on October 19, 1989, he responded to the introductory flier, which was mailed around October 6, 1989,[3] by requesting a general catalogue of Artiste Internationale's available products.[4] The government in turn sent LaChapelle a letter on December 6, 1989, requesting that he specify his interests. On December 18, 1989, LaChapelle express mailed a letter specifying his areas of interest, including (in his own words) "sex acts with very young participants." In his letter, LaChapelle explained that he would "be interested in any way we can expedite receipt of your literature and any way we can expedite orders." On March 9, 1990, the government mailed a child pornography catalogue to LaChapelle. LaChapelle ordered two videos, "Her First Sex" and "Wet Dream," on March 20, 1990. The catalog listed the ages of the video performers as eleven years old ("Her First Sex") and twelve and fourteen years old ("Wet Dream"), and detailed the sexual acts that the children performed in the two movies.

On April 23, 1990, a postal inspector delivered the ordered videos to LaChapelle; ten minutes later, government agents executed a search warrant at his home and found the two videos underneath LaChapelle's bed. While executing the warrant, the government also seized numerous pornographic videotapes and magazines, including one video featuring a minor girl, in which the script introducing the film describes the movie as being about a boy who seduces his nine-year-old sister.[5] According to LaChapelle, the widow of one of his best friends in the Navy gave him the tape in 1961 after her husband died in a plane crash. When he received the film, it was on an eight millimeter reel, which LaChapelle transferred to videotape in 1974; LaChapelle claimed that the only time he viewed the tape prior to this case was during the 1974 transfer.

## DISCUSSION

### I. Entrapment

*Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992), controls this case. In that case, the Supreme Court reversed Keith Jacobson's conviction for receiving child pornography through the mail. While not disputing "the evils of child pornography or the difficulties that laws and law enforcement have encountered in eliminating it," *id.*, 112 S.Ct. at 1540 (citations omitted), the Court ruled that Jacobson's conviction could not stand because the "Government did not prove that [Jacobson's] predisposition was independent and not the product of the

---

**2.** According to the agent who conducted the investigation, "no one actually came out and said I want to buy child pornography. But from my experience from dealing with these and through my investigations, I made the determination ... [that] 300 of these particular individuals were asking for child pornography."

**3.** LaChapelle received two introductory flyers because the fictitious company name he used for ordering pornography appeared twice on the mailing list.

**4.** The delays in correspondence result from the fact that the government used a Belgium mailing address.

**5.** With respect to this video, the trial judge stated "I watched the video, and determined that the girl shown in that video is under eighteen. I don't think there's any question about it."

attention that the Government had directed at [him over a two-and-one-half year period]." *Id.* at 1541 (citations omitted). As explained below, because the government established that LaChapelle quickly and independently inquired about the availability of child pornography, ordered such material as soon as he could, and placed his order without being pressured to campaign against censorship, we are convinced that LaChapelle was independently predisposed to order child pornography through the mail, and therefore this case is distinct from *Jacobson.*

On appeal, LaChapelle argues that the government illegally entrapped him as a matter of law. To establish entrapment as a matter of law, LaChapelle must prove "(1) that the government induced h[im] to engage in the crime; and (2) that [ ]he lacked the necessary predisposition to perform the criminal conduct." *United States v. Hinton,* 908 F.2d 355, 357 (8th Cir.1990) (citing *Mathews v. United States,* 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988)).

To establish the first element of inducement, LaChapelle must demonstrate "that a government agent 'originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the crime; and that the defendant then committed the crime at the urging of the government agent.' " *Id.* (quoting *United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978)). The facts here prevent LaChapelle from making this demonstration. LaChapelle, not the government, first mentioned child pornography, or as LaChapelle put it, "sex acts with very young participants." Until LaChapelle inquired about the availability of child pornography, the government never solicited, advertised, or suggested the subject.[6] Moreover, when LaChapelle fixated on child pornography, he did so enthusiastically. He *express* mailed his letter specifying his interest in "sex acts with very young participants" and requested a method to *expedite* receipt of the catalogue of materials depicting such acts. Then, as soon as he received the child pornography catalogue, he placed an order. In sum, the evidence does not demonstrate that the government either originated the criminal design, implanted in the mind of an innocent person the predisposition to commit a crime, or urged LaChapelle to order child pornography. Thus, as a matter of law, the government did not induce LaChapelle to commit a crime.[7]

Even if we reached the contrary conclusion, LaChapelle has not established that he lacked the necessary predisposition to

**6.** In response to Artiste Internationale's request that LaChapelle "specify the areas in which you are interested," LaChapelle mailed the following letter (capitalization in original):

> In reply to your recent correspondence (copy attached), I would be interested in the following areas:
> 1. Hard Core Bondage: Particularly Breast Bondage (there is one tape I have heard of where a woman is suspended by her breasts).
> 2. Punishment and Piercing.
> 3. Vaginal and Anal Penetration with VERY large objects (Fisting, Dildoes, Large animals, etc.).
> 4. Sex acts with very young participants.
> I am somewhat concerned with the fact that you reship in the US by means of the US mail. US Postal Inspectors have been opening suspect packages and confiscating and intimidating both senders and recipients for some time. We have found that ANY OF THE SMALL PACKAGE SHIPERS [sic] OFFER FAR MORE SECURE DELIVERY (Such as UPS, DHL, Federal Express). WE ARE MORE THAN WILLING TO PAY FOR SHIP-

> MENT BY THESE MEANS, FROM YOUR U.S. DROP POINT TO US.
> We would also be interested in any way we can expedite receipt of your literature and any way we can expedite orders (FAX perhaps, with international bank transfer). We also ask that you respond only to our company name and address.
> Regards,
> W.C. LaChapelle

**7.** This holding conforms with *Jacobson,* in which the government conceded that it induced Jacobson to order child pornography through the mail. *See Jacobson,* 112 S.Ct. at 1540 n. 2. Unlike the situation here, where LaChapelle independently and unilaterally inquired about the availability of child pornography and proceeded to order such materials at the first available opportunity without the government pressuring him to do so, in *Jacobson,* the government mentioned child pornography in at least five mailings and aggressively urged Jacobson to battle censorship in four mailings before Jacobson finally broke down and ordered a magazine.

order child pornography. Predisposition "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *United States v. Mathews,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) (citations omitted). The Supreme Court extensively discussed this element in *Jacobson,* ruling that the government failed to prove beyond a reasonable doubt that prior to being approached by the government Jacobson was not predisposed to commit the same crime for which LaChapelle has been convicted. *Jacobson,* 112 S.Ct. at 1543.

The facts in *Jacobson* contrast sharply with those here. For example, no less than five government operations, involving two federal agencies, targeted Jacobson, whereas LaChapelle was targeted by a single Customs' operation. More specifically, over a two-and-one-half year period, Jacobson received numerous applications to join pornography clubs, two sexual attitude surveys (each of which referenced child pornography without Jacobson first mentioning the subject), several letters lobbying for First Amendment protection of pornography and against the current regime of censorship, personal letters from a phony pen pal, and child pornography catalogues. *Id.* at 1538–39. Conversely, LaChapelle received in total only two introductory fliers (because the name of his fictitious company appeared twice on the mailing list), one "specify your interests" letter, one letter explaining how items were shipped to the United States, and (after he specified his interest in "sex acts with very young participants") one child pornography catalogue. As we discuss below, because of these differing factual backgrounds, the considerations which inspired the Supreme Court's reversal of Jacobson's conviction do not compel such a ruling here.

In *Jacobson,* the Court evaluated (and rejected) several factors, which according to the government demonstrated Jacobson's predisposition. First, although Jacobson in 1984 ordered two magazines with photographs of nude preteen and teenage boys, the Court did not consider this proof of Jacobson's predisposition to commit the crime of receiving child pornography through the mail, because when Jacobson ordered the magazines in 1984, his actions were not yet illegal. Thus, while perhaps indicating "a predisposition to view sexually-oriented photographs that are responsive to sexual tastes," his 1984 order offered "scant if any proof of petitioner's predisposition to commit an illegal act." *Id.* at 1541. This consideration applies here to the limited extent that the trial court improperly admitted the child pornography video which the government seized from LaChapelle when it also seized the two videos he ordered from Artiste Internationale. *See* Part IV *infra.*

The other factors relied upon by the Court to reverse Jacobson's conviction do not apply here. Specifically, Jacobson did not demonstrate that he wanted to order child pornography until the government first suggested that he receive such material and then devoted two-and-one-half years to convincing him that he should receive child pornography. *Id.* at 1538–39. Conversely, after only two months, LaChapelle independently expressed (without the government mentioning the subject) his desire to receive child pornography through the mail and then ordered child pornography as soon as he could. Moreover, while the government repeatedly urged Jacobson to order child pornography "as part of a fight against censorship and the infringement of individual rights," *id.,* the government here did not encourage LaChapelle to join such a campaign. In fact, the government never raised the subject of censorship or any political concerns. In sum, because LaChapelle promptly and independently inquired about child pornography without being pressured to do so in any way and ordered such material at the first available opportunity, we are persuaded that the government did not entrap William LaChapelle as a matter of law.

## II. DUE PROCESS

LaChapelle next contends that the government's conduct violated his due process rights. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637,

1642–43, 36 L.Ed.2d 366 (1973). We disagree. The mere fact that LaChapelle expediently responded to the government's flier and then unilaterally inquired about the availability of child pornography prevents us from concluding that "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.;* *see also United States v. Musslyn,* 865 F.2d 945, 946 (8th Cir.1989) ("The outrageous government conduct defense is not available to Musslyn because he was clearly predisposed to order child pornography and the government's agents involved only acted in concert with Musslyn's illegal request.").

### III. JURY INSTRUCTION ON ENTRAPMENT · BY ESTOPPEL

■ The district court refused LaChapelle's request that the jury be instructed that:

The defense of entrapment by estoppel is made out when two facts are shown. First, you must find the government agents or officials took it upon themselves to define for the defendant the scope of his legal obligation—in this case, the legality of the video tapes the government was selling by implying that these videos tapes would clear Customs upon entering into the United States.

Second, the defendant relied upon the advice in conducting his affairs.

LaChapelle contends that under the law of this court "[t]he defense of '[e]ntrapment by estoppel applies when an official tells the defendant that certain conduct is legal and the defendant believes the official.'" *United States v. Austin,* 915 F.2d 363, 366 (8th Cir.1990) (quoting *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 825 (9th Cir.) *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985)).

The facts here do not warrant LaChapelle's proposed instruction. Indeed, only

one fact supports LaChapelle's position. In his October 19, 1989 letter responding to Artiste Internationale's introductory flier, LaChapelle specifically inquired about the Belgium-based pornography distributor's "means for clearing U.S. Customs." In a subsequent letter, Artiste International informed LaChapelle that it bulk shipped its products to companies in the United States, which then shipped its products with United States postage to its customers.

Beyond this explanation, no other evidence even inferred the legality of materials Artiste Internationale possessed for sale.[8] On the other hand, beginning with its initial fliers and concluding with its last mailing to LaChapelle, Artiste Internationale strongly suggested the illicit nature of its materials. For instance, the introductory flier alerting LaChapelle to the existence of Artiste Internationale touted the distributor as "specializ[ing] in the extremely hard to obtain erotica," who guaranteed that "if we don't have it, you can't get it," and as a distributor willing to stock items despite "certain bans and stateside attitudes." The introductory flier's request not to use Artiste Internationale's name when writing it additionally suggested the illegal nature of its dealings. These suggestions took material form in the child pornography catalogue, which listed the ages of the videotaped performers as ranging from six to fifteen years old. In addition to the inferences of the introductory flier and the specificity of the catalogue, LaChapelle's own behavior—requesting that the United States Postal Service not be used, inquiring as to how the materials cleared Customs, and suggesting the use of private package shippers—indicates that he never considered his actions to be lawful.

Given all of these facts and the absence of an explicit assurance of legality, the district court did not err in refusing to instruct the jury on entrapment by estoppel. *See id.* at 365 ("Criminal defendants are entitled to an instruction on their theory of defense if the proposed instruction is

---

**8.** Although LaChapelle claims that he interpreted the explanation as assuring the legality of Artiste Internationale's business, the intricacy of

its American distribution system also could be understood as a means of avoiding the detection of illegality.

... supported by the evidence." (citations omitted)).

## IV. REFUSAL TO SUPPRESS EVIDENCE

 LaChapelle next objects to the district court's refusal to suppress at trial the videotape (of a sexually active nine-year-old girl), which the government seized from LaChapelle's home. LaChapelle argues that the government improperly introduced the video to illustrate LaChapelle's bad character or to demonstrate his propensity to commit the charged crime, while the government contends that the evidence properly reflected on LaChapelle's knowledge of and intent to order child pornography. *See Fed.R.Evid.* 404(b).

We review evidentiary rulings for an abuse of discretion. *United States v. Marshall*, 683 F.2d 1212, 1215 (8th Cir.1982) (citation omitted). In reviewing the district court's admission, we find it pivotal that LaChapelle based his defense (in part) on a claim of entrapment.[9] With this defense in mind, we conclude that the district court abused its discretion in admitting the contested evidence because when LaChapelle first possessed the film in question,[10] such possession was legal, and according to *Jacobson*, "[e]vidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it." *Jacobson*, 112 S.Ct. at 1542; *see* discussion at 634–35 *supra*. Thus, under *Jacobson*, the contested evidence cannot be considered as evidence of predisposition and therefore its probative value regarding LaChapelle's intent and knowledge is greatly diminished. In this situation, the video's prejudicial effects of inciting the jury and portraying LaChapelle as a sick individual outweigh its probative value. *See Fed.R.Evid* 403. Because, however, LaChapelle inquired about the availability of child pornography without the government first suggesting the subject, ordered such material at the first available opportunity to do so, and did so without the government encouraging him to join the fight against censorship or any other campaign, we consider the admission of the contested video to be harmless error and decline to reverse his conviction. *See United States v. Armijo*, 834 F.2d 132, 135 (8th Cir.1987).

## V. REFUSAL TO LOWER GUIDELINES SENTENCE

LaChapelle finally appeals from the district court's refusal to depart downward from his guidelines sentence. LaChapelle contends that the district court erroneously believed that it did not have the authority to depart downward, and thus we should review its decision. *See United States v. Sayers*, 919 F.2d 1321, 1324 (8th Cir.1990). Reviewing the transcript of the sentencing hearing convinces us, however, that the district court was fully aware of its prerogative to depart downward but nonetheless concluded that the facts of this case did not warrant such a departure. We accordingly find no merit in LaChapelle's argument.

## CONCLUSION

We affirm both William LaChapelle's conviction and sentence.

---

9. LaChapelle also claimed that he did not know he had ordered child pornography.

10. As we explained in the "FACTS" section, LaChapelle obtained the video in 1961 from the widow of a Navy buddy.