# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2696

_____

United States of America

*Plaintiff - Appellee*

v.

Jeremy Kelley

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: February 10, 2017
Filed: June 30, 2017

_____

Before SMITH,[1] GRUENDER, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Jeremy Kelley was convicted of one count of receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), three counts of receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), and one count of

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

possessing child pornography involving a minor under 12 years old in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). The district court[2] sentenced Kelley to five concurrent 124-month sentences. The court also imposed a $2,000 fine and a $5,000 special assessment pursuant to the Justice For Victims of Trafficking Act of 2015. Kelley appeals his conviction, arguing that the district court erred in denying his motion for acquittal, admitting testimony regarding his use of adult pornography, and imposing the $5,000 special assessment. Finding no error, we affirm.

## I. *Background*

In May 2015, the Internet Crimes Against Children Task Force—a coordinated effort of federal, state, and local law enforcement—identified an Internet Protocol (IP) address in Northwest Arkansas that was used to download videos known to contain child pornography as previously catalogued by the National Center for Missing and Exploited Children. Using investigative software, law enforcement determined that approximately 59 files of known child pornography were downloaded from this IP address using the Ares peer-to-peer file-sharing network between January 7th and May 5th of 2015. Investigators traced the IP address to a Cox Communications account connected to a residence owned by Jeremy Kelley and his wife in Prairie Grove, Arkansas.

On June 25, 2015, investigators executed a search warrant on the residence connected to the internet account. Kelley and his wife were home when the search began. Special Agent Gerald Faulkner of Homeland Security Investigations interviewed Kelley, who confirmed that his family had internet service through Cox Communications and that the service was secured by a password. Kelley admitted that he was the primary user of a Toshiba laptop found in the living room and that his wife and other family members all used their own computing devices. Although Kelley and

---

[2]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

his wife were the home's only full-time residents, Kelley's children from other marriages would occasionally visit. Kelley admitted to having a paid membership to the Ares peer-to-peer network. He claimed that he had not used the Ares program to download pornography in years and that he only downloaded adult pornography. Agent Faulkner testified that Kelley admitted viewing adult pornography, stating:

> I asked Mr. Kelley in the past what type of pornography, and he relayed that it was adult pornography, or what he called role-playing pornography, where adult females are made to look like underage teenage girls.

***

> I asked Mr. Kelley when he did use[] to look up child pornography through Ares, what search terms, [and] he said that he would use "office sex," "lesbian," "young teen," "teen," and "Vicky Vette."[3]

***

> I informed him that the downloads of known child pornography videos in question were approximately between January 7th through May 5th of 2015, at which time Mr. Kelley recanted his initial statement and said that he had, in fact, downloaded adult pornography during that timeframe through Ares.

***

> I asked Mr. Kelley if any of those videos contained child pornography or depicted children of questionable ages. He said that some of them looked very young. One video in particular that he described, that based on the camera angle from the video and the underdevelop[ed] chest area of the child, it was hard to determine whether it was a boy or a girl.

---

[3]Vicky Vette is an adult pornography performer.

-3-

Agent Faulkner also testified that Kelley recognized some of the titles of the files that the Task Force had identified as downloaded under Kelley's IP address: "Mr. Kelley advised that some of the titles in the downloads did look familiar, and he acknowledged the use of the term 'Vicky' in the titles." According to Agent Faulkner, a search for "Vicky," instead of "Vicky Vette," often returns child pornography depicting "an actual real girl [named Vicky] that has been rescued and identified by law enforcement, and her series of videos that had been transferred all over the world are now a known recognition to the National Center For Missing and Exploited Children."

Before leaving Kelley's home, law enforcement confiscated the computing devices found there, including the Toshiba laptop primarily used by Kelley. The computer had three user profiles, enabling access by Kelley, his wife, and his son. Detective Andy Higdon of the Fayetteville Police Department completed a forensic analysis of the Ares program on Kelley's laptop. He testified that Kelley's password-protected profile had run searches for files using the terms "8-yr-old," "daughter incest," "daughter lover," "kidnapped girl," "playtime niece," "sex uncle," and "pedo." He also testified that someone had searched for "Vicky" but not "Vette" using the program. Detective Higdon described how the Ares search feature worked: "when you're searching through the Ares program[,] for instance, the search keyword 'daughter incest,' that can be any part of the file. . . . If 'daughter' is a part of that filename, it's going to pull that. If 'incest' is a part of that filename, it's going to pull that." As an example, Detective Higdon described one of the video files found on Kelley's computer called "8-year niece learns sex with uncle," which could have been discovered through the search feature using several of the identified search terms including "8-yr-old," "sex uncle," and "playtime niece."

Detective Travis Monson of the Springdale Police Department also completed a forensic examination of Kelley's laptop. At trial, Detective Monson testified to finding more than an hour of video footage spread across 15 different video files

containing child pornography. All the child pornography files were found on Kelley's password-protected profile, using the Ares account paid for by Kelley. Detective Monson identified the four files at issue in Kelley's indictment: three appeared to have been downloaded on May 5th between 1:17 p.m. and 2:07 p.m., and one was downloaded on May 1st. Detective Monson testified that download dates could be manipulated by adjusting the computer clock. He also noted the possibility of a batch download in which a user initiates the download of multiple files, and each file receives a timestamp at the time of its completion—thus, a person could start a large download in the morning, and each file would receive a timestamp at some point later in the day when the respective downloads are completed. Detective Monson also testified that a number of videos were in Kelley's "Recent Folder," meaning that the files had been accessed recently. The laptop also had installed a utility program called CCleaner. Among other things, this program is commonly used to remove pornography from computers. Kelley stipulated that all 15 videos contained images of child pornography involving minors under the age of 12. At the close of the government's case, Kelley moved for a judgment of acquittal, which the court denied.

Kelley largely defended against the charges by claiming an alibi. He asserted that on May 5, 2015, the day in which three of the video files were downloaded onto his computer, he was in Fort Smith, which is about 60 miles away from his home in Prairie Grove. He presented a single alibi witness, Heather Mann, who was a paramour of Kelley's. Mann testified to eating lunch in Fort Smith with Kelley on May 5, 2015, at a restaurant called China Jade. She estimated that she arrived at lunch around noon and was back at work by 1:15 p.m. She remembered distinctly that it was raining. Under cross-examination, Mann acknowledged conversing with Kelley about that rendevous as happening on a Wednesday.

> Q.   Now, do you remember further in that conversation . . . Jeremy
>       Kelley said, "I can remember what I was wearing. I knew exactly

-5-

that it was either May 5th or May 6th. I looked at my calendar and it was a Wednesday"?

Do you remember him telling you that?

A.    Yes.

Q.    And he knows for sure it was a Wednesday because he was going to go down on Monday and he wasn't able to do so. So he went down two days later on a Wednesday. And then he went back on that Friday. So he remembers it was a Wednesday.

So Wednesday, May 5th?

A.    Yes, sir.

The prosecution then informed Mann that May 5, 2015, was actually a Tuesday. Later, meteorologist Dan Skoff testified that according to historical weather data, Tuesday, May 5, 2015, was "completely clear" of precipitation, but that it rained for most of the day on Wednesday, May 6, 2015.

Kelley also testified about his activities on May 5, 2015. He claimed to have left his house around 8:45 a.m. to make sales calls in Fort Smith. He ate lunch with Mann and then visited a friend. He claimed to have returned home around 3:30 p.m. He also claimed that it was raining that day. He presented no further testimony, although claiming to meet with at least three other people. He produced no receipt from the restaurant, no credit card statement, no telephone or text message records, nor any documentation to verify that any of the meetings in Ft. Smith occurred on May 5th.

Regarding the files on his computer, Kelley admitted to seeing an image "of a person from the shoulder about midthigh from the side that had an arm that was raised," but he claimed that it occurred "[a]t least seven years passed." He also

-6-

admitted to using the search terms "office sex," "young teen," "lesbian," and "Vicky Vette," but that such searches occurred "many years ago." But later he admitted to "lying to [his wife] about [porn] and covering up the porn addiction" during the relevant time period. Although the 15 files of child pornography were discovered in his "My Shared Folder" and many of the files were also in the "Recent Folder," Kelley testified that he never noticed them on his computer.

Asserting his innocence, Kelley claimed that his children or his wife must have downloaded the child pornography.

Q. Well, sir, I guess I'm a bit confused where you're going with your testimony. Is it your testimony that someone else in your house was downloading this child porn, either your wife or your kids?

A. I don't know who it was.

***

Q. So your wife, your wife could have went on your profile, used your Ares account to download this child pornography in your name; is that correct?

A. That's correct. It's possible.

Q. Your kids, you're saying, could have went on their father's computer, under their father's name, and downloaded child pornography; is that right?

Yes or no, sir. Are they using that computer?

A. They are using the computer, yes.

Kelley presented no evidence that his wife, who works full-time in a separate city, or his children, who normally only visit on weekends, were at the Prairie Grove residence during the relevant time period, mid-day in the middle of the week.

After hearing all the evidence, a unanimous jury convicted Kelley on five counts: one count of possessing child pornography found on his laptop and four counts of receiving child pornography—one count for a file downloaded on May 1st and three counts for files downloaded on May 5th. At sentencing, the district court imposed five 124-month sentences to run concurrently. In evaluating the imposition of the $5,000 special assessment pursuant to the Justice for Victims of Trafficking Act of 2015, the court noted that although Kelley qualified for appointed counsel, the concerns of adequate representation are different than those regarding the application of a limited assessment. Kelley's presentence investigation report (PSR) provided him a slightly negative net worth with assets consisting mainly of the family's two vehicles (valued at $16,677) and liabilities consisting mainly of his wife's student loan debt (approximately $15,000) and a credit card (estimated at $1,700). These numbers did not include any information regarding the value of the family home. Before sentencing, the Kelleys sold their residence, but neither Kelley nor his wife provided the court with any details about the sale. The PSR estimated the value of the residence at $98,000. When asked about his house under oath, Kelley claimed no knowledge of its value, the equity in the mortgage, or its selling price. The court determined that Kelley's explanation of his indigence lacked credibility and imposed the special assessment. Kelley now appeals, challenging his conviction and the imposition of the special assessment.

## II. *Discussion*

Kelley argues that the district court erred in (1) denying his motion for acquittal; (2) admitting testimony regarding his use of adult pornography; and (3) imposing the special assessment according to the Justice for Victims of Trafficking Act of 2015. We disagree and affirm.

A. *Motion for Acquittal*

"In reviewing the denial of a motion for a judgment of acquittal, we review the sufficiency of the evidence *de novo*, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." *United States v. Wright*, 739 F.3d 1160, 1167 (8th Cir. 2014). "[I]t is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence. It is enough if the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt." *Id*. (quoting *United States v. Surratt*, 172 F.3d 559, 564 (8th Cir. 1999)). "If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *United States v. Fang*, 844 F.3d 775, 778 (8th Cir. 2016) (quoting *United States v. Serrano–Lopez*, 366 F.3d 628, 634 (8th Cir. 2004)). "This is a very strict standard of review." *Id.* (quoting *United States v. Thunder*, 745 F.3d 870, 875 (8th Cir. 2014)) (internal quotation marks omitted).

To convict Kelley, the government had to prove beyond a reasonable doubt that Kelley "knowingly" received or possessed child pornography. *See* 18 U.S.C. §§ 2252(a)(2), 2252A(a)(2), 2252A(a)(5)(B). Kelley contends that the government failed to sufficiently prove that he knowingly received or possessed the files containing child pornography, knew that such files contained child pornography, or knew that the minors depicted were under 12 years old. "The convictions for receipt and possession of child pornography turn on essentially the same requirements and evidence, and thus will be discussed together." *United States v. Worthey*, 716 F.3d 1107, 1113 (8th Cir. 2013) (quoting *United States v. White*, 506 F.3d 635, 641 (8th Cir. 2007)). "We construe [defendant's] challenges as disputing whether he was the one who downloaded the child pornography and if so, whether he 'received' or 'possessed' the child pornography." *Id.*

Kelley stipulated "that all 15 videos are, in fact, child porn, fit the definition [in the statute], some including minors under the age of 12." This stipulation is

conclusive. *Gander v. Livoti*, 250 F.3d 606, 609 (8th Cir. 2001). Further, Detective Monson examined the list of files on Kelley's computer and testified that the file title of each video accurately described its contents. For example,

> Q.     So when we read "little boy 10-year-old playing with man pthc,"[4] "little boy 10-year-old playing with man," it's a 10-year-old boy playing sexually with a man?
>
> A.     Yes, sir.

The jury could reasonably infer that any person aware of the existence of the video files on the computer would also be aware of their contents due to the files' sexually explicit titles. The jury could rationally conclude that one who knowingly possessed files with such descriptive titles knowingly acquired possession of child pornography according to the relevant statutory definitions.

Despite acknowledging the nature of the files on his computer, Kelley argues that the illegal files may have been downloaded without his knowledge. He notes that the Ares program automatically created folders containing the contraband upon download, and someone else could have initiated the relevant downloads. Thus, the simple existence of the child pornography on his password-protected profile does not necessarily prove that he had knowledge of its existence. This assertion, while true, misconstrues the evidence. Kelley was convicted of receiving four files downloaded on May 1 and May 5, 2015. His computer was confiscated on June 25, 2015. These explicitly titled video files were discovered in the "My Shared Folder" and in the "Recent Folder." The jury could have reasonably inferred that Kelley, having primary control of his computer during the relevant time, would be aware of these files in these general folders. A cursory browse of either folder would uncover the offensive videos with little effort. In *Worthey*, we reviewed a similar peer-to-peer file-sharing

---

[4]The abbreviation "pthc" stands for "preteen hardcore."

program and determined that files depicting child pornography, even in the folders automatically created by the program, indicated that such "files containing the child pornography were searched for and downloaded [in the file-sharing program] by the user." 716 F.3d at 1113. The Ares program automatically created the "My Shared Folder," but a user had to affirmatively download the illegal files for them to be in the folder in the first place. The presence of these files in these folders on a computer with a user profile under Kelley's control sufficiently shows an affirmative step to obtain the files and knowledge of the effort's success.

Relatedly, Kelley argues that because other people had access to his computer, the government failed to prove that he was the person who received or possessed the child pornography. In *United States v. Acosta*, we rejected this same argument because other evidence in the record pointed to the defendant's constructive possession. 619 F.3d 956, 961 (8th Cir. 2010). The child pornography was downloaded to Kelley's password-protected profile, on a computer primarily used by him, and using a program paid for by Kelley—we find this evidence provides a sufficient basis for the jury to infer Kelley's knowledge. *See United States v. Grauer*, 701 F.3d 318, 324 (8th Cir. 2012) (finding a home-office laptop that no one else used regularly sufficient to establish constructive possession of child pornography). Kelley suggested that it was possible that someone else downloaded the files. But Kelley presented no evidence that any other person had access to his personal computer on May 1, 2015, or in the early afternoon on May 5, 2015. Although Kelley and his alibi witness testified that he was not home during the time of the three illicit downloads, the jury rejected the theory that another person was responsible. Morever, Kelley admitted at trial to seeing an image that "didn't appear to be a full-grown adult." He claimed that he viewed the image seven years prior and that he immediately deleted the file, yet Detective Monson testified to finding a similar image still saved on Kelley's computer. Agent Faulkner testified that Kelley told him that he viewed this image during the relevant time period. This testimony provides a basis for the jury to infer that Kelley knowingly downloaded the video containing the image during the

-11-

relevant time and knowingly retained it on his computer. "We will not overturn a jury verdict if the jury picks one of two plausible scenarios presented by testimonial evidence." *Fang*, 844 F.3d at 779.

Sufficient evidence supports the jury's verdict of guilt beyond a reasonable doubt.

## B. *Prejudicial Testimony*

"We usually review challenges to the district court's evidentiary rulings for an abuse of discretion, reversing only if an error was not harmless. If the admission of a contested piece of evidence was not timely objected to at trial, however, we review for plain error." *United States v. White Bull*, 646 F.3d 1082, 1091 (8th Cir. 2011) (citation omitted). "To prevail under plain error review, a defendant must demonstrate an error that was plain, affected defendant's substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Espinoza*, 684 F.3d 766, 778 (8th Cir. 2012).

Kelley argues that Agent Faulkner's statements regarding Kelley's use of adult pornography were unfairly prejudicial and in violation of Federal Rule of Evidence 403. Kelley did not object to this testimony at trial, so we review its admission for plain error. "Unfair prejudice under Rule 403 means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013) (quoting *Fireman's Fund Ins. Co. v. Thien*, 63 F.3d 754, 758 (8th Cir. 1995)). Kelley argues that this testimony was unduly prejudicial because "it implied a propensity to view any pornography," and that its prejudicial effect outweighed its probative value. Agent Faulkner's statements did not unfairly prejudice Kelley.

We accord "particularly great deference" to the district court in Rule 403 determinations because the circumstances of such evidentiary rulings require

balancing in the context of the courtroom. *United States v. Jean–Guerrier*, 666 F.3d 1087, 1093 (8th Cir. 2012). Agent Faulkner's testimony related four basic facts: (1) Kelley admitted to looking at adult role-playing pornography in the past; (2) Kelley used certain search terms in looking for pornography, including "young teen" and "Vicky Vette" on Ares; (3) Kelley admitted to downloading adult pornography in the relevant time period; and (4) Kelley admitted to downloading an image that depicted a person with underdeveloped features. These factual assertions connected Kelley to the computer containing the illicit material during the relevant time period and connected Kelley to using Ares to download pornography. Moreover, none of these facts are unnecessarily inflammatory or offensive to the point of "encourag[ing] the jury to find guilt from improper reasoning." *Condon*, 720 F.3d at 755 (quoting *United States v. Muhlenbruch*, 634 F.3d 987, 1001 (8th Cir. 2011)).

Kelley relies mainly on two cases to support his prejudice argument: *United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993), and *United States v. LaChapelle*, 969 F.2d 632 (8th Cir. 1992). Both are distinguishable. In *Harvey*, the Second Circuit ordered a new trial for the defendant in a child pornography case, in part because the prosecution presented "descriptions of the contents of the adult X-rated videotapes, beyond those that involved either child pornography or simulated child pornography." 991 F.2d at 996. These descriptions included disturbing content relating to sadomasochism and sexual activity involving human excrement. *Id.* Importantly, the prosecution in *Harvey* provided extensive descriptions of adult role-playing pornography and descriptions of images of underdeveloped minors, but the inclusion of this evidence did not contravene Rule 403. *See id.* (finding "simulated child pornography" appropriate evidence). Kelley argues that the mere mention of his use of role-playing pornography by itself is unfairly prejudicial, but *Harvey* implies the reverse. Similarly, in *LaChapelle*, the government introduced a video of child pornography possessed by the defendant. 969 F.2d at 638. The defendant acquired the material 30 years prior to trial. *See id.* at 634. We held that admitting the video violated Rule 403, but that the error was harmless. *Id.* at 638. Unlike *Harvey* or

-13-

*LaChapelle*, the government in this case did not seek to admit explicit video footage into evidence, nor did witnesses describe the contents of the video files with shocking or offensive detail. Agent Faulkner's testimony was relevant to the crimes charged, non-explicit, and did not unfairly prejudice Kelley. We find no error, let alone plain error.

### C. *Special Assessment*

At sentencing, the district court imposed a special assessment pursuant to the Justice for Victims of Trafficking Act of 2015, 18 U.S.C. § 3014. The statute requires that "the court shall assess an amount of $5,000 on any non-indigent person" convicted of specified offenses relating to human trafficking and sexual exploitation. *Id.* § 3014(a). Money from the assessment is to be sent to the Domestic Trafficking Victims' Fund. *Id.* § 3014(c)–(d). The statute uses the phrase "shall assess," which mirrors the "shall assess" language of 18 U.S.C. § 3013—a statute that requires a non-discretionary special assessment for the Crime Victims Fund. *See United States v. Dobbins*, 807 F.2d 130, 131–32 (8th Cir. 1986). Both statutes mandate that the district court assess money against defendants for the benefit of victims, and funds are to be collected "in the manner that fines are collected in criminal cases." 18 U.S.C. §§ 3013(b) & 3014(f). Unlike § 3013, in which the court cannot consider the defendant's ability to pay, § 3014 expressly limits its special assessment to "non-indigent" persons. *See id.* § 3014(a). Section 3014 is silent, however, on how courts should determine a defendant's indigent status.

The United States Senate unanimously passed § 3014 as a sweeping effort to provide services for victims of human trafficking and juvenile sexual abuse. *See* 161 Cong. Rec. S2337–38 (daily ed. Apr. 22, 2015). "We are throwing a lifeline to these victims of human trafficking by providing them real resources to help them—to help first to rescue them and then to help them heal." *Id.* at S2337 (statement of Sen. Cornyn). Through § 3014, Congress created the Domestic Trafficking Victims' Fund to "award grants or enhance victims' programming" under the Trafficking Victims

-14-

Protection Reauthorization Act of 2005, the Trafficking Victims Protections Act of 2000, the Victims of Child Abuse Act of 1990, and the PROTECT Our Children Act of 2008. 18 U.S.C. § 3014(e).

> This legislation also allows Federal judges to impose not only prison for these criminals, but may order that fees go into a fund. That fund can be used for victims' services and even training for peace officers.

161 Cong. Rec. H3278 (daily ed. May 18, 2015) (statement of Rep. Poe). The bill passed by an overwhelming majority in the House of Representatives, and was signed into law by the president.

Kelley contends that the district court erred by imposing the special assessment in his case. He argues that because he met the indigence requirement for court-appointed counsel, he does not meet the requirement of "non-indigent" under § 3014. Because the statutory language does not provide clear guidance on how to determine indigence under § 3014, we look to analogous areas of the law for direction.

Kelley argues that we should treat § 3014 indigence determinations as we do in forma pauperis (IFP) determinations under 28 U.S.C. § 1915.[5] *See United States v. Fincher*, 538 F.3d 868, 878 (8th Cir. 2008) ("IFP status on appeal is dependent upon [defendant's] eligibility for court appointed counsel at the trial level."). As the district court noted, however, there is a fundamental difference between a court's judgment in appointing an attorney to represent an indigent client and assessing a fee after trial:

---

[5]During oral argument, Kelley conceded that he bore the burden of proving indigence under 18 U.S.C. § 3014. *Cf. United States v. Anderson*, 567 F.2d 839, 840 (8th Cir. 1977) (recognizing the defendant bears the burden of indigence for the appointment of counsel).

-15-

The Court finds that for purposes of this statute that the defendant is not indigent. Now, obviously he qualified for appointment of counsel, but the concerns are not the same because to retain an attorney to try a case to defend a person in a case prosecuted by the United States government, it is likely that an attorney would charge well in excess of $5,000 and that the cap on this particular assessment is limited to $5,000, which this Court finds that the defendant, while in the presentence report it indicates that he has a negative net worth, the Court finds that he certainly has the education and skills to be employed and to earn money from which he could pay this assessment.

The constitutional right to a fair trial is implicated in the appointment of counsel for indigent defendants. *Martinez v. Ryan*, 566 U.S. 1, 12 (2012) ("Defense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged."). In granting court-appointed counsel, the court assesses a defendant's immediate ability to pay because "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Id.* (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)). "The Criminal Justice Act provides a framework for ensuring that individuals who are financially unable to afford defense counsel are provided counsel as required by the Sixth Amendment." *Fincher*, 538 F.3d at 875; *see also* 18 U.S.C. § 3006A. Fines or fees imposed after trial cannot infringe upon this fair-trial right. *Cf. United States v. Owen*, 854 F.3d 536, 541 (8th Cir. 2017) (saying the Sixth Amendment does not apply in revocation proceedings because "[t]he same constitutional interests are not at stake"). Further, post-trial fines and fees trigger additional protections: A defendant cannot be punished with imprisonment for his failure to pay, and he can assert his indigence at future enforcement proceedings. *See United States v. Bartsh*, 985 F.2d 930, 933–34 (8th Cir.), *adhered to in part on reh'g*, 7 F.3d 114 (8th Cir. 1993). Even the IFP statute allows the court to assign trial-related costs to the defendant after judgment. *See* 28 U.S.C. § 1915(f).

Because the special assessment under § 3014 deals with sentencing-phase considerations, the indigence analyses of similar post-conviction assessments are more helpful than the analysis used for determining IFP status or appointed counsel. For fines under the Sentencing Guidelines, for example, the district court "shall" impose a fine unless the defendant can prove his indigence. U.S.S.G. § 5E1.2. The defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is "not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Herron*, 539 F.3d 881, 888 (8th Cir. 2008). For restitution orders under the Victim and Witness Protection Act of 1982, we have encouraged courts to "make 'specific findings of fact about the defendant's financial resources, financial needs and earning ability'" and to use those findings for determining restitution amounts. *Means v. United States*, 961 F.2d 120, 121 (8th Cir. 1992) (quoting *United States v. Owens*, 901 F.2d 1457, 1459 (8th Cir. 1990)). Because "standards have been developed by the Department of Justice indicating enforcement proceedings should not be instituted unless the person has the means of supporting himself," *id.*, special assessments under § 3014 logically allow for the district court to consider future earnings because of the safeguards included in the ordinary way criminal fines are collected. *See* 18 U.S.C. § 3014(f). Using these statutory schemes as guideposts, we think that in the context of § 3014 indigence determinations, an analysis of both a defendant's current financial situation and his ability to pay in the future is appropriate in determining his "non-indigent" status. *See United States v. Strange*, No. 16-10128, 2017 WL 2199005, at *2 (9th Cir. May 18, 2017) (analyzing defendant's ability to work in imposing the special assessment).

Additionally, the mandatory language of § 3014 excludes discretionary decisions by the court once non-indigence has been determined. *Cf. Rutledge v. United States*, 517 U.S. 292, 301 (1996) ("We begin by noting that 18 U.S.C. § 3013 requires a federal district court to impose a $50 special assessment for every conviction . . . ."). We ordinarily review the district court's fact-finding at sentencing for clear error. *See, e.g.*, *United States v. Aden*, 830 F.3d 812, 816 (8th Cir. 2016)

(noting restitution awards under the Mandatory Victims Restitution Act of 1996 are reviewed for "clear error"); *United States v. Allmon*, 500 F.3d 800, 807 (8th Cir. 2007) ("A district court's imposition of a [Guidelines] fine and the determination of the amount of the fine will not be reversed unless clearly erroneous." (quoting *United States v. Berndt*, 86 F.3d 803, 808 (8th Cir.1996))). The indigence determination under § 3014 is a fact issue, and as in analogous contexts, we will review the district court's fact-finding for clear error. *See Strange*, 2017 WL 2199005, at *2. In this case, the district court's fact finding relied largely on its determination of Kelley's credibility. *Cf. United States v. Marshall*, 411 F.3d 891, 895 (8th Cir. 2005). "It is well established that in sentencing matters a district court's assessment of witness credibility is quintessentially a judgment call and virtually unassailable on appeal." *Id.* (quoting *United States v. Quintana*, 340 F.3d 700, 702 (8th Cir. 2003)).

Kelley's PSR gave him a slightly negative net worth at the time of sentencing. The court evaluated this financial assessment and noted that it lacked any information regarding the sale of Kelley's residence (valued at approximately $98,000). The court questioned Kelley about the profit made from the residence's sale, but Kelley claimed that he had no information about the value of the house, its selling price, or his equity in its mortgage: "Mr. Kelley has claimed that he does not know any of that when I questioned him here today[,] . . . but the Court finds that explanation to be lacking in credibility." From this, the court determined that Kelley was "not indigent." Further, the court determined that even taking Kelley's negative net worth at face value, Kelley, an Eagle Scout with a college degree, "certainly has the education and skills to be employed and to earn money from which he could pay this assessment." This ability to earn money in the future precluded a finding of indigence for purposes of § 3014. Looking at all the factors of Kelley's financial situation, the district court determined that Kelley would, at some point, be able to pay the special assessment. In making this determination, the court did not clearly err.

### III. *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

_____