# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1860

_____

United States of America

*Plaintiff - Appellee*

v.

Gilbert G. Lundstrom

*Defendant - Appellant*

_____

No. 16-2313

_____

United States of America

*Plaintiff - Appellee*

v.

Gilbert G. Lundstrom

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: June 6, 2017
Filed: January 19, 2018
_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Gilbert Lundstrom, the former Chief Executive Officer and Chairman of the Board of TierOne Bank, was charged in a thirteen-count indictment with conspiracy to commit wire fraud affecting a financial institution, to commit securities fraud, and to falsify bank entries, 18 U.S.C. §§ 1349, 371; wire fraud affecting a financial institution, id. § 1343; securities fraud; id. § 1348; and falsifying bank entries, id. § 1005. The superseding indictment alleged that beginning in or around 2008, Lundstrom and others at TierOne devised and executed a scheme to defraud the bank's shareholders and to mislead its regulators by concealing millions of dollars in losses related to the failure of certain real estate loans. TierOne's former President and Chief Operating Officer, James Laphen, and former Senior Vice President and Chief Credit Officer, Don Langford, pleaded guilty to their roles in the conspiracy and, along with other witnesses, testified at the three-week jury trial that resulted in Lundstrom's conviction on twelve counts.

The district court[1] sentenced Lundstrom to 132 months' imprisonment and ordered him to pay $3.1 million in restitution. Lundstrom appeals, challenging the denial of his motion for judgment of acquittal, the admission of certain evidence, the denial of his motion for a bill of particulars, the jury instructions, the application of

_____

[1]The Honorable John M. Gerrard, United States District Judge for the District of Nebraska.

two sentencing enhancements, the substantive reasonableness of his sentence, and the calculation of the restitution award.  We affirm.

## Background

We relate the facts in the light most favorable to the jury's verdict.  See United States v. Kelley, 861 F.3d 790, 796 (8th Cir. 2017) (standard of review).  TierOne, a commercial bank and financial institution, was headquartered in Lincoln, Nebraska, and historically focused its lending business on residential loans in Nebraska and nearby states.  TierOne was required by federal banking laws and regulations to disclose its financial condition to the Office of Thrift Supervision (OTS), which also conducted onsite examinations at least annually and requested written responses to other periodic inquiries.  Lundstrom became TierOne's president in 1994 and its CEO around 2000.  TierOne became a public company in 2002, raising $200 million in capital from stock sales to investors.  After becoming a public company, TierOne was also required to disclose its financial condition to the Securities Exchange Commission (SEC) by filing, among other documents, annual and quarterly reports that included financial statements audited by an outside accounting firm.  As TierOne's CEO, Lundstrom was required to certify that the reports filed with the SEC did not contain any material misstatements or omissions of fact.

Under Lundstrom's leadership, TierOne expanded its traditional residential lending business to include lending for "less conservative" commercial and construction projects, many of which were located outside TierOne's traditional midwest lending area (Turbo Assets).  TierOne opened "loan production offices" around the country, whose sole purpose was to generate Turbo Assets.  The Turbo Assets strategy had a dramatic impact on TierOne's loan portfolio:  the bank held almost $2.5 billion in commercial and construction loans in 2005, compared to $500 million in 1999.  Turbo Assets became the bank's "biggest growth sector," while residential loans fell from 45% of the bank's loan portfolio in 2000 to only 12% in 2005.

Although Turbo Assets originating from loan production offices in Arizona, Florida, Nevada, and North Carolina initially performed well, TierOne was also exposed to greater risk as a result of the lending strategy. These commercial and construction loans involved large sums of money that the bank would recoup only after the borrower completed its development or construction project and sold it for a price sufficient to cover the amount borrowed.[2] As the real estate markets in some of TierOne's new lending territories began to deteriorate in or around 2007, real estate prices began to decline, and the builders and developers who had borrowed from TierOne had difficulty finding buyers for their projects. When those projects did not sell, or sold at reduced prices, the borrowers were less likely to repay their loans, in which case TierOne was faced with the prospect of foreclosing on the property pledged as collateral for the loan. TierOne's portfolio of foreclosed properties grew from $18.7 million in October 2008 to $63.7 million in October 2009, forcing the bank to assume responsibility for taxes, maintenance, utilities, and general upkeep on the foreclosed properties. TierOne was also required to take "write-downs" or losses on its financial statements if the value of its loan collateral or foreclosed properties declined.

In April 2008, the OTS conducted an onsite field visit to TierOne, following which it downgraded the bank's financial-health rating based on "problems . . . of a serious nature" in the deteriorating quality of the bank's loan portfolio. The OTS instructed TierOne to increase its "core capital ratio" to 8.5% to ensure that the bank had sufficient capital available to absorb potential losses in its loan portfolio. Lundstrom agreed in writing to maintain the 8.5% ratio. The OTS conducted a comprehensive examination of TierOne's capital and asset positions later in June 2008, which included a review of the reserves the bank had set aside to cover losses

---

[2]A commercial loan generally includes money to fund both construction and the interest accruing on the loan. The borrower thus does not make payments on either principal or interest until the project is completed.

on nonperforming loans.[3] In October 2008, the OTS issued a Report of Examination (Report), concluding that TierOne's reserves were underfunded and that the bank was not employing a reliable methodology by which to calculate reserves on its nonperforming loans. The Report found that TierOne's "[a]ppraisals of land development and construction loans [were] inadequate and unsupported." Without a reliable appraisal, TierOne could not accurately value the collateral underlying a given loan and thus could not accurately value its assets in its financial reports. The Report also found that TierOne's "[m]anagement [had] failed to implement an appropriate appraisal review process" and that its methodology for calculating reserves required improvement.

The Report identified deficiencies in TierOne's Las Vegas commercial and construction loans, noting that the bank had issued loans without appraisals or with unsupported or stale appraisals. It also observed that TierOne had exacerbated losses on certain loans by continuing to disburse funds, despite indications that a project's value had declined. The Report recommended that TierOne increase its reserves as a loan migrated toward nonperforming status. TierOne's financial-health rating was downgraded based on its "seriously weak" financial condition that threatened "the ultimate viability of the bank." Lundstrom reviewed and signed the Report.

TierOne's Board of Directors entered into a Supervisory Agreement, "a formal enforcement action," with the OTS in January 2009, committing to correct certain deficiencies identified in the Report. Among other commitments, TierOne agreed to

---

[3]Assume, for example, that a bank loaned $1 million to a borrower who pledged land valued at $1.2 million as collateral. If the land's value dropped to $900,000 over the course of the loan and the borrower had difficulty repaying the loan, the bank would reclassify the loan as "nonperforming," set aside $100,000 to cover its loss, and record the loss on its financial statements. Thus, for a real estate loan, the value of the underlying collateral affects the reserve for that particular loan and the for the bank's overall loan portfolio.

allocate adequate capital for its reserves, reaffirmed its earlier commitment to maintain a core capital ratio of 8.5%, and pledged to establish procedures that would require current and well-supported appraisals on applicable loans. TierOne also acquiesced to enhanced regulatory scrutiny, in particular agreeing to prepare complete and accurate minutes of its Board of Directors meetings and to transmit copies of those minutes to the OTS. Lundstrom signed the Supervisory Agreement in his capacity as Chairman and CEO, consenting on behalf of TierOne to comply with the terms of the Agreement.

As required by the Supervisory Agreement, TierOne hired an outside consulting firm to review its portfolio of loans exceeding $1 million. The firm recommended to Lundstrom in January 2009 that TierOne downgrade thirty loans, including the reclassification to "substandard" of nine loans totaling $130 million. TierOne rejected the recommendation, thereby avoiding the need to increase reserves by $5-7 million to account for the potential losses on the downgraded loans.

It was against this backdrop that the government alleged that Lundstrom and other TierOne executives—President James Laphen, Director of Lending Gale Furnas, Chief Credit Officer Don Langford, and Chief Financial Officer Eugene Witkowicz—conspired to understate reserves and defer the recognition of losses associated with TierOne's nonperforming loans and foreclosed properties by delaying appraisals on the underlying collateral or the foreclosed properties. The majority of TierOne's inventory of foreclosed properties eventually had outdated appraisals and inflated values that did not reflect the impact of the downturn in the real estate market.

Laphen testified that he, Lundstrom, and Furnas agreed on the plan to defer new appraisals to the third quarter of 2009, just before the OTS was scheduled to conduct its next onsite examination. Langford confirmed that the plan was adopted under "direction [from] the corner offices," *i.e.*, from Lundstrom and Laphen. Laphen

explained that delaying appraisals allowed TierOne to defer the recognition of losses attributable to its nonperforming loans and foreclosed properties while management attempted to raise capital and improve the bank's balance sheet. Had the new appraisals been obtained and the resulting losses recognized, the bank would have been required to set aside additional reserves, with the result that its earnings and available capital would have decreased, which, in turn, would likely have caused the bank's core capital ratio to fall below the 8.5% mandated by the OTS. The delay in obtaining appraisals also prevented TierOne from foreclosing on additional nonperforming loans because a current appraisal was required to initiate a foreclosure proceeding.

The government presented detailed testimony about how the plan was implemented with respect to several specific loans. When the construction loan came due in August 2008 on Towne Vistas, a 62-unit condominium project in Las Vegas, Nevada, Lundstrom and other executives agreed to extend the due date on the loan and to provide an additional $5 million in financing without a new appraisal, thereby increasing the loan balance to more than $32 million. The OTS had questioned the validity of the bank's appraisal on the Towne Vistas project in its Report, noting that the appraisal was outdated, provided an overly aggressive valuation, and had not been properly reviewed by management. TierOne falsely reported in its response that it had ordered a new appraisal and had obtained additional collateral on the project. In April 2009, Laphen received notice from the borrower that the project's value had declined so dramatically that it was worth roughly $10 million less than the amount of the loan. Laphen forwarded this notice to Lundstrom, but instead of treating the loan as "delinquent," recognizing the loss, and increasing reserves by $10 million, Lundstrom and Laphen elected to continue disbursing loan proceeds to the borrower.

TierOne had loaned roughly $20 million to developer Carlos Escapa for multiple Las Vegas projects. The OTS expressed concern about these loans, and Laphen responded in July 2008 that TierOne planned to foreclose on the properties.

The foreclosure did not occur, however, and in August 2008, Laphen informed Lundstrom that Escapa had indicated that he needed an additional $800,000 to complete the projects. In September 2008, Laphen informed Lundstrom by email that the loan funds disbursed on several of Escapa's projects exceeded the estimated sales prices for those projects. TierOne did not obtain new appraisals to verify the market value of those properties, nor did it set aside additional reserves to account for the potential losses. In February 2009, the bank was required to pay $450,000 in outstanding taxes on Escapa's projects in order to avoid a tax lien and foreclosure by the state. Laphen testified that a potential buyer expressed interest in purchasing several of Escapa's properties. Furnas rejected the offers at Lundstrom's direction, however, because the offers were below the value TierOne was carrying on its books for these properties. The bank was "not in a position to accept this amount of loss" because it would "probably" have decreased the bank's core capital ratio below 8.5%. Langford also testified that accepting the offers would have resulted in "a loss of millions of dollars" and a requirement that the bank "set aside additional reserves." According to Langford, Lundstrom decided in May 2009 that Escapa should continue to list his properties at the inflated prices so "the foreclosure and appraisals could be pushed into the third quarter." TierOne expected to lose $6.5 million on Escapa's loans, but it did not increase reserves by that amount because its core capital ratio would have fallen below 8.5%.

TierOne loaned $21.5 million for a Kansas condominium development called Mansions at Canyon Creek. The OTS Report indicated that the Canyon Creek loan appeared to be impaired and that "[i]mpairment analysis should be performed at maturity in October 2008 by obtaining new appraisal." Lundstrom certified in TierOne's response to the Report that the bank had "satisfied" this deficiency, but in fact had not obtained a new appraisal. On March 3, 2009, roughly one month after providing this response to the OTS, Lundstrom approved an agreement to modify and extend the loan, including a provision that "[r]eceipt of [a new] appraisal shall not be a condition of closing." When the borrowers fell roughly $500,000 into arrears two

months later, Lundstrom approved a second modification to the loan, advancing an additional $162,000 to pay the borrower's outstanding taxes. TierOne did not order a new appraisal prior to either loan modification. By June 2009, TierOne anticipated a loss of almost $6 million on the Canyon Creek project but did not reclassify the loan as impaired because, according to Langford, it "was too big a loss to add to the bucket of losses," and it would have reduced the bank's core capital ratio below 8.5%.

Langford testified that after a December 2008 meeting to discuss the bank's problem loans, Lundstrom asked Furnas for an estimate of the bank's aggregate exposure in unrecognized losses. Furnas replied that the bank had $60-75 million in unrecognized losses in its portfolios. Laphen and Langford testified that around March 2009, Lundstrom directed Furnas to prepare a detailed, loan-by-loan analysis of TierOne's loan portfolio to determine a dollar figure for potential losses and the increase in reserves that the bank would "likely" have to set aside "in the next 6 months." Laphen informed Lundstrom that he was concerned about the preparation of this analysis because, if "it showed additional losses, the bank should have recognized those losses" in contravention of "the plan to not get appraisals until just before the examiners came."

As instructed, Furnas and others reviewed each of TierOne's loan files, including outdated appraisals and outstanding balances, and Furnas prepared a spreadsheet titled, "Potential Reserve Additions Needed Due to Timing of New Appraisals." The spreadsheet provided a range of potential losses that the bank could face over the second, third, and fourth quarters of 2009, depending on the quarter in which the bank "expected to receive a new appraisal" for the collateral underlying each loan. The spreadsheet estimated that the bank would likely suffer the greatest loss and require the greatest increase in reserves in the third quarter of 2009, when the conspirators "expected to have to get new appraisals for the OTS visit." Furnas's spreadsheets stated that the bank stood to lose (and would be required to increase reserves by) a total of $35 million over the last three quarters of 2009 in the "best"

case, $60 million in the "expected" case, and $113 million in the "worst" case. Langford testified that it "wasn't possible" for the bank to recover the full amount of its loans and that there was "[n]o chance" the bank could avoid recording losses and increasing reserves when new appraisals were obtained that showed substantially lower values on loan collateral. The spreadsheet also listed the date of the most recent appraisal on the collateral underlying each loan, revealing that many appraisals had not been updated since 2005 or 2006.

Furnas told Langford that Lundstrom "didn't think that it was necessary or appropriate to present" the spreadsheet information to the Board. Furnas and Langford disagreed with Lundstrom, and Furnas presented the information during a Board meeting. Contrary to typical practice, the spreadsheet was not included in the Board's official meeting binder. Instead, Laphen and Langford testified, copies of the spreadsheet were distributed at the meeting, with Lundstrom insisting that the copies be collected after the meeting. The minutes from this meeting reported only that Furnas and Langford provided an "Analysis of Critical Loans in [the] Portfolio."

Furnas updated his spreadsheets in May 2009 in preparation for a meeting with Lundstrom, revising the loss/reserve calculations to reflect $36 million in the "best" case, $60 million in the "expected" case, and $114 million in the "worst" case. Furnas presented the updated spreadsheet during the May 2009 Board meeting. The draft minutes from that meeting initially noted that the Board had discussed "obtaining appraisals on nonperforming loans at the present time or in a subsequent quarter." The secretary responsible for preparing the official minutes indicated in her notes, however, that Lundstrom had personally directed her to remove mention of Furnas's presentation from the official minutes. Her handwritten notes state that "Gil [Lundstrom] did not put in" any reference to the appraisal discussion. At the June 2009 Board meeting, Furnas reported that his worst-case projections "were proving to be more accurate" and that the Board should plan for that eventuality. Despite this warning, Lundstrom took no action to require TierOne to recognize the projected

losses or allocate additional reserves, a course of action that would have caused the bank's core capital ratio to fall below 8.5%.

David Frances, who was hired by TierOne in August 2008 to manage its inventory of problem loans, was concerned about the bank's outdated appraisals and delayed recognition of losses. Frances sent an email to Langford and Furnas in February 2009, expressing concern that TierOne "continue[d] to expose [itself] adversely . . . with outdated appraisals" on loan collateral whose value had declined. Frances acknowledged that the "write-downs" that TierOne would be required to recognize after obtaining new appraisals "would likely be astronomical," but, he queried, "in good conscience[,] how long can we continue to believe these [properties] are properly reserved?" Frances recommended that TierOne obtain an updated appraisal whenever a loan was evaluated for impairment. Laphen testified that he sent Frances's email to Lundstrom, who took no action in response to the concerns raised therein.

Frances sent another email to Langford and Furnas on August 3, 2009, which stated that the bank "continue[d] to fail to properly risk rate [its] loans and . . . [to] refuse to update collateral valuations, out of the fear of what impact these actions may have on reserve levels." Frances wrote that he was "unable to support the timing of reappraisals to delay loss recognition or increases to the reserves into later quarters." Laphen testified that he and Furnas discussed the email in Furnas's office shortly after it was sent and that he went to Lundstrom's office immediately thereafter to deliver the information. Frances resigned a few weeks later, "frustrated" with TierOne's "unwillingness to . . . order[] new appraisals on loans that were experiencing financial difficulty," "concerned that [the bank was] misleading the public," and worried about his professional reputation. Laphen forwarded Frances's resignation email to Lundstrom.

As CEO of TierOne, Lundstrom was required to certify on each of the bank's SEC filings that the "report d[id] not contain any untrue statement of material fact or omit t[o] state[] [a] material fact," and that the statements set forth therein were "not misleading." He was further required to certify that the report disclosed "[a]ll significant deficiencies and material weaknesses in design or operation of internal control over financial reporting," as well as "[a]ny fraud, whether or not material, that involves management or other employees" with financial reporting responsibilities. Lundstrom provided similar certifications to the outside accountants, who reviewed TierOne's financial statements prior to their inclusion in the bank's SEC filings. Lundstrom did not disclose the bank's outdated appraisals, overvalued loan and foreclosed-property portfolios, and understated reserves, despite his knowledge of these facts from Frances's emails, Furnas's spreadsheets, and discussions with other bank executives. Laphen testified that, had this information been disclosed to TierOne's outside accountants, they would have had "a great deal of difficulty certifying" the accuracy of the financial statements included in the bank's SEC filings.

In late July 2009, as the bank was preparing its second quarter filing with the OTS, Laphen and Furnas met with Lundstrom to "go over loan loss provisions," *i.e.*, reserves, and provisions for foreclosed-property losses for the quarter. Lundstrom reviewed a draft of the OTS filing, which revealed that the "potential charge-offs, the charges to income," would leave TierOne "short about $4 million" in its capital ratios and cause its core capital ratio to fall to 8.37% for the quarter. Lundstrom remarked to Laphen that the bank "couldn't afford this" outcome, which Laphen interpreted as Lundstrom's "direction to not have . . . losses that large." Laphen testified that the next day he spoke with Chief Financial Officer Witkowicz, who "had come up with an approach that would . . . allow the capital ratios to stay within compliance." Witkowicz proposed "a series of changes to small expense items" and a $3.5 million change to TierOne's unallocated reserves, *i.e.*, the capital that the bank had allotted for general losses, but not for losses associated with particular loans. Witkowicz's

plan reduced by $3.5 million the sum that TierOne had allotted for unallocated reserves. These numbers corresponded to Lundstrom's handwritten notes on the draft OTS filing. After these adjustments were made, TierOne exceeded the 8.5% core capital ratio by $309,000, and Lundstrom certified to the accuracy of the figures in the bank's second quarter 2009 OTS filing. Lundstrom also certified in TierOne's second quarter 2009 report to the SEC that the bank had fulfilled all its obligations under the Supervisory Agreement with the OTS, including its obligation to maintain a core capital ratio of at least 8.5%.

TierOne issued press releases when filing reports with the OTS or the SEC, typically announcing that the bank continued to maintain strong capital levels relative to peer institutions and continued to meet or exceed its regulatory requirements. The press release for the second quarter of 2009 stressed that TierOne had maintained its 8.5% core capital ratio. In addition to the press release, Lundstrom emailed all TierOne employees, many of whom were also shareholders, stating that the bank "ha[d met] and continues to meet or exceed all regulatory capital requirements." Shareholders and potential investors relied on TierOne's regulatory filings with the OTS and the SEC, as well as its press releases to the public, when they decided to purchase or hold shares of TierOne stock. Shareholders also learned of TierOne's financial condition during annual shareholder meetings. During his presentation at the May 2009 meeting, Lundstrom denied that TierOne had applied for funds from the federal Troubled Asset Relief Program (TARP), which provided financial assistance to certain banks after regulators determined that eligibility requirements had been met. In fact, however, TierOne had submitted a TARP application in November 2008, seeking $86.3 million in assistance. On May 11, 2009, ten days before the shareholder meeting, the OTS had informed Lundstrom that it would reject TierOne's TARP application based on the bank's poor financial condition. Lundstrom withdrew the application before it could be officially rejected by the OTS.

The OTS returned to TierOne in August 2009 to conduct "a limited review of certain loans to analyze . . . whether . . . the bank was carrying those loans at the appropriate value," as required under the Supervisory Agreement. An examiner specifically questioned the Towne Vistas loan, which had not been reappraised in the year since the OTS had first instructed to the bank to obtain a new appraisal. Lundstrom expressed no surprise at the bank's failure to obtain a new appraisal and did not order an investigation into that failure. The OTS began its annual examination of the bank in October 2009. When questioned, Lundstrom denied any effort to delay new appraisals. Following the examination, the OTS issued "exceptions"—formal allegations regarding conduct of the bank's management. Laphen and Langford testified that Lundstrom was "intimately involved" in the process, editing, signing, and submitting the bank's final response to the OTS's exceptions. In addition to the exceptions, the OTS instructed Lundstrom by email to obtain an opinion from the bank's outside accountants, addressing whether $88.3 million in losses scheduled to be recognized in December 2009 should have been recorded in earlier quarters and whether the bank's previous financial statements should be restated to reflect such a correction. Lundstrom did not contact the bank's outside accountants, instead responding to the OTS that the accountants could not opine on the issue because "an individual asset analysis" was not possible because such data "was not a driver of [TierOne's] macro review process." In fact, however, an "individual asset analysis" was possible and had been performed by Furnas, who had set forth that loan-by-loan analysis in his spreadsheets. Lundstrom did not inform the OTS about Furnas's analysis or the spreadsheets. TierOne's outside accountants later resigned, citing the bank's failure to disclose Furnas's spreadsheets in its resignation letter.

The OTS eventually learned about Furnas's spreadsheets from Frances. An OTS examiner had searched the binders and official minutes from the bank's Board meetings for copies of the spreadsheets, but Lundstrom had instructed the Board secretary not to include those documents in the official Board record. The examiner

-14-

finally obtained copies of the spreadsheets from Langford. During a meeting with Lundstrom after the OTS had obtained copies of Furnas's spreadsheets, Laphen suggested that Lundstrom tell the OTS that the spreadsheets had not been prepared to quantify potential losses or reserve requirements but for consideration by an investment firm TierOne had hired to facilitate a potential sale of the bank. Laphen admitted that this explanation was untrue. When the OTS later asked Lundstrom about Furnas's spreadsheets, Lundstrom responded as Laphen had suggested, *i.e.*, that Furnas had prepared the spreadsheets in advance of meetings with the investment firm and that they were intended to provide loss projections in the event that TierOne implemented an aggressive liquidation strategy for its loan portfolio prior to a sale of the bank.

As contemplated under the conspirators' plan, new appraisals on the bank's foreclosed properties and loan collateral were ordered beginning in the third quarter of 2009. Langford described the resulting effect on the bank's finances as "horrific" and "remarkably close" to, or even worse than, the worst-case scenario set forth in Furnas's spreadsheets. TierOne was required to file a restatement with the SEC in October 2009 that corrected its second quarter 2009 filing to reflect an "additional loss provision" of $13.9 million. The restatement also disclosed that the bank's core capital ratio had fallen below 8.5% as of June 30, 2009. Following the receipt of the new appraisals that were obtained in November 2009, TierOne reported an additional $120 million in losses and a corresponding increase in reserves for the third quarter of 2009, with the result that the bank's core capital ratio had dropped to 4%.

Lundstrom was replaced as CEO in January 2010. The OTS closed the bank in June 2010, with the Federal Deposit Insurance Corporation (FDIC) being named as its Receiver. TierOne filed for bankruptcy shortly thereafter. Its stock price fell below $1 per share and was delisted from the NASDAQ Exchange. Many TierOne employees lost their jobs and many TierOne shareholders lost the money they had invested in the bank's stock.

**Motion for Judgment of Acquittal**

Lundstrom first argues that the district court erred in denying his motion for judgment of acquittal. We review *de novo* the denial of a motion for judgment of acquittal that challenges the sufficiency of the evidence to support a conviction. See Kelley, 861 F.3d 790, 796 (8th Cir. 2017). We consider the evidence, and all reasonable inferences that may be drawn therefrom, in the light most favorable to the jury's verdict. Id. We do not weigh the evidence or assess the credibility of the witnesses. United States v. Wallace, 852 F.3d 778, 783 (8th Cir. 2017). If evidence consistent with guilt exists, we will not reverse simply because the facts and circumstances may also be consistent with some innocent explanation. See Kelley, 861 F.3d at 796. Under this "very strict standard of review," id. (citation omitted), we will reverse "only if no reasonable jury could have found [the defendant] guilty," United States v. Delgrosso, 852 F.3d 821, 829 (8th Cir. 2017).

Lundstrom contends that the government failed to demonstrate that he possessed the "requisite knowledge of any conspiracy or the requisite intent to defraud investors or bank regulators." Br. of Appellant at 14. He argues that the government failed to present direct evidence that he had knowingly agreed to any plan to delay appraisals for the purpose of deferring losses and increases to reserves or that he had done so with the intent to defraud shareholders and regulators. Such evidence was not required, however, for "[c]ircumstantial evidence alone can prove the elements of conspiracy," including knowledge. United States v. Foster, 740 F.3d 1202, 1205 (8th Cir. 2014) (quoting United States v. Dotson, 570 F.3d 1067, 1068 (8th Cir. 2009)). "Even when there is no direct proof of a conspiracy, 'the jury is free to consider all the evidence—direct and indirect—presented of the defendant's statements and actions' and they may 'draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence.'" United States v. Turner, 583 F.3d 1062, 1067 (8th Cir. 2009) (quoting United States v. Wilson, 103 F.3d 1402, 1406-07 (8th Cir. 1997)). Moreover, conspiracy "may be implied by the surrounding circumstances or by

-16-

inferences from the actions of the parties." United States v. Boesen, 491 F.3d 852, 857 (8th Cir. 2007) (quoting United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003)). Similarly, an intent to defraud "need not be shown by direct evidence," but may instead "be inferred from all the facts and circumstances surrounding the defendant['s] actions." Id. (citation omitted); see also United States v. Louper-Morris, 672 F.3d 539, 556 (8th Cir. 2012) ("Fraudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions." (citation omitted)); United States v. Krug, 822 F.3d 994, 999-1000 (8th Cir. 2016) (same).

We conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that Lundstrom possessed the knowledge and intent required to sustain his convictions.

Laphen testified that he, "Lundstrom, Furnas, Langford and others . . . agreed to delay the ordering of certain appraisals, and that [this] delay resulted in delaying [TierOne's] recognition of losses . . . and improper reporting to . . . shareholders." He further explained that delaying appraisals allowed the bank "to delay the taking of losses," providing the bank "time to try to raise capital" to improve its balance sheet. Laphen recalled a conversation with Lundstrom "in which [Lundstrom] was aware and a part of [this] process." Moreover, Langford testified that Furnas told him that TierOne "[couldn't] afford any more . . . write-downs based on getting appraisals that we could avoid getting . . . because of management discretion in the timing" of appraisals. Furnas told Langford that the bank would thus delay new appraisals to the third quarter of 2009 and that these directions originated "from the corner officers" on the eighth floor—offices occupied by Lundstrom and Laphen. Frances's emails identified multiple loans and properties on which appraisals were, or would be, "older than 12 months . . . as of March 2009."

It was Lundstrom himself who directed Furnas to prepare spreadsheets to quantify the losses embedded in TierOne's loan portfolio. As recounted above, not only did Lundstrom take no corrective action upon receiving the requested information, he opposed the disclosure of the spreadsheets to the Board of Directors and, that effort failing, insisted that the spreadsheets be distributed and re-collected during the Board meeting, rather than being placed in the Board binders, where they would be subject to OTS inspection and ordered that a reference to the Board's discussion at its May 2009 meeting on nonperforming loans be removed from the official minutes.

As also recounted above, the jury heard testimony that Lundstrom personally approved actions that deferred TierOne's recognition of losses on the Towne Vistas, Escapa, and Canyon Creek projects after the OTS questioned the viability of those loans or the validity of the appraisals on the property underlying them. He agreed not to get a new appraisal, opting instead to extend the Towne Vistas loan and provide an additional $5 million in financing without obtaining a new appraisal, while at the same time reporting to the OTS that TierOne had "satisfied" the OTS's concerns about the project. Rather than initiating foreclosures on properties underlying certain Escapa loans, the bank then attempted to sell those properties at the inflated values listed in their outdated appraisals in an effort to delay the foreclosures until the third quarter of 2009. Lundstrom falsely informed the OTS that the bank had "satisfied" the directive that it obtain a new appraisal on the underlying collateral supporting the Canyon Creek loan and instead had approved a loan modification with the specific stipulation that "[r]eceipt of [an] appraisal shall not be a condition of closing."

The evidence that Lundstrom took specific steps to conceal TierOne's losses and deteriorating financial health from shareholders and regulators further supports the jury's finding that Lundstrom knew about and entered into a conspiracy with others to commit fraud and to submit false information to the OTS and the SEC and that he intended to and did commit the charged offenses.

Despite his knowledge of the bank's outdated appraisals, overvalued loan and foreclosed-property portfolios, and understated reserves, Lundstrom certified a July 2009 OTS report which stated that TierOne had adequate reserves and an 8.51% core capital ratio which was followed that day by a press release announcing that TierOne was "in compliance" with the 8.5% ratio.

Likewise, TierOne's August 2009 mandatory SEC filing stated that TierOne had "met or exceeded the[] elevated ratios mandated by the OTS," had "fulfilled all of the obligations set forth in the [S]upervisory [A]greement," and "continue[d] to comply with the ongoing reporting requirements." The filing further stated that TierOne "review[ed] [its] other real estate owned," *i.e.*, its foreclosed-property portfolio, "for impairment in value whenever events or circumstances indicate that the carrying value . . . may not be recoverable." Lundstrom certified that this SEC filing "fairly present[ed] in all material respects the financial condition" of the bank, despite his knowledge of the nonperforming loans, outdated appraisals, and inadequate reserves set forth in Furnas's spreadsheet and Frances's emails.

Lundstrom's certified filings with the OTS at the end of July and August 2009 stated that TierOne had maintained a core capital ratio above 8.5%, despite his knowledge from Furnas's spreadsheets that this statement was inaccurate. His response to an OTS inquiry in September 2009 stated "that it is probable that [TierOne] will ultimately collect all amounts due" on the Canyon Creek loan. The jury heard evidence, however, that Lundstrom knew that this statement was inaccurate, for he knew that the Canyon Creek project was worth $6 million less than the outstanding loan balance and that the borrowers had already failed to comply with an earlier modification of the loan.

Lundstrom's response to an OTS inquiry in October 2009 stated that TierOne's outside accountants could not perform the requested individual analysis of the bank's loan portfolio because of the bank's particular bookkeeping protocol. The evidence

showed, however, that not only was Lundstrom aware that had TierOne had never asked the accountants to conduct the analysis, but also that Furnas had in fact performed the loan-by-loan analysis that the OTS had requested. Lundstrom's December 2009 response to the OTS stated that management "ha[d] implemented the various plans and polices and undertaken the analysis required by the provisions in its Supervisory Agreement." The jury could reasonably conclude from this evidence that his representations were false and that Lundstrom had knowingly submitted them with the intent to mislead the OTS.

As Laphen testified, while Lundstrom's statement during a 2009 shareholder meeting that "TierOne is not seeking to participate in the TARP program" may have been "technically true," it was misleading because shareholders would not have known that TierOne had applied for TARP funds and had withdrawn the application only after learning that it would have been denied by the OTS. A reasonable jury could conclude that Lundstrom's statements gave shareholders the false impression that the bank's financial strength did not warrant TARP assistance.

Lundstrom's arguments on appeal mirror those that he made to the jury: that he had Furnas prepare the spreadsheets as a valuation model for consultants; that it was implausible that he would request the preparation of spreadsheets that revealed allegedly criminal conduct and permit their presentation to the Board; and that he disclosed to the OTS in August 2009 that it was the bank's practice to estimate declines in real estate prices by discounting appraisal values that were older than six months rather than to obtain new appraisals. It was for the jury to consider and determine the truth of Lundstrom's assertions. See United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010) ("A jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony."). The jury ultimately rejected Lundstrom's theory that he did not have the requisite knowledge and intent and accepted the government's competing theory that he did. See Krug, 822 F.3d at 1000

(concluding that the evidence was sufficient to support a guilty verdict, where the evidence was consistent with both the defendant's and the government's theories of the case).

To summarize, the evidence at trial established that Lundstrom and other TierOne executives agreed to delay new appraisals of assets in the bank's loan and foreclosed-property portfolios in order to avoid recognizing losses on those assets and setting aside additional reserves to account for those losses. Lundstrom helped execute the plan by refusing to authorize new appraisals, by approving extensions or modifications of nonperforming loans without obtaining new appraisals, and by delaying foreclosures on nonperforming loans. The evidence pointed inexorably to the conclusion that Lundstrom knew of the deteriorating quality of the bank's loan and foreclosed-on property portfolios and its precarious overall financial condition, and that he then offered false representations in regulatory filings and press releases about TierOne's capital position and regulatory compliance. We thus conclude that the evidence was sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Lundstrom possessed the knowledge and intent necessary to sustain his convictions, and the district court thus did not err in denying his motion for judgment of acquittal.

### Bill of Particulars

Lundstrom contends that the district court erred in denying his motion for a bill of particulars, which argued that the indictment and discovery materials were not sufficiently detailed to allow him to prepare for trial. A bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial. United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993). We review for abuse of discretion the denial of a motion for a bill of particulars and will not overturn a conviction based on such a denial unless the defendant suffered prejudice due to actual surprise at trial. United States v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009).

-21-

In denying the motion, the magistrate judge noted that the government had provided Lundstrom with a searchable electronic database of discovery documents, a Bates-stamped index of database materials, a lengthy index of paper documents, an index of exhibits labeled during an earlier SEC enforcement proceeding, and copies of depositions of former TierOne employees and outside accountants taken during the SEC proceedings. The magistrate judge further noted that the government had disclosed a list of 400 "hot documents," which represented the materials most relevant to the government's case. The government also identified the key documents that corresponded to each count of the indictment.

We conclude that the district court did not abuse its discretion in overruling Lundstrom's objections to the magistrate judge's ruling. See id. (affirming denial of a motion for bill of particulars where "the government explained its theory of the case" and "provided [the defendant] with considerable discovery"). The government's disclosures were sufficient to enable Lundstrom to understand the nature of the charges against him, prepare a defense, and avoid any surprise. See id.

**Hearsay - "Agent or Employee"**

Lundstrom next challenges several of the district court's evidentiary rulings, which we review for abuse of discretion. See United States v. Stong, 773 F.3d 920, 923 (8th Cir. 2014).[4] He first argues that the district court improperly admitted hearsay statements of Tom McCool and problem-loan manager David Frances as statements of an "agent or employee" under Federal Rule of Evidence 801(d)(2)(D). Prior to trial, the district court conditionally admitted these statements under Rule 801(d)(2)(E) as statements by co-conspirators during the course of and in furtherance of the conspiracy. The court granted Lundstrom a continuing objection to this ruling.

---

[4]The government argues that a clear-error standard of review applies to the district court's finding that an agency relationship exists, citing Industrial Indemnity Co. v. Harms, 28 F.3d 761, 762 (8th Cir. 1994). We need not resolve the issue, however, for the admission of these statements was proper under either standard.

The jury heard testimony from Laphen that TierOne had hired McCool as a credit specialist to negotiate with borrowers and to solicit purchase offers for the bank's portfolio of nonperforming loans and foreclosed properties in Las Vegas. Laphen testified that he received an email from McCool stating that TierOne's outdated appraisal of the Towne Vistas project overvalued the project by at least $10 million. Langford testified that McCool provided regular updates to him and other TierOne executives by phone and email. Langford further testified that after receiving an email from McCool in July 2008, Langford understood that "land prices [in Las Vegas] had just been decimated" and that the bank should "expect[] a significant downfall" in the value of the Towne Vistas project. Langford testified that McCool participated in TierOne's problem-asset meetings, which Lundstrom also attended. The government called Frances to testify, and also introduced the two emails that Frances had sent to Langford and Furnas, each of which complained about TierOne's appraisal practices, loan-rating procedures, and valuation deficiencies, and each of which was forwarded to Lundstrom.

At the close of trial, the district court determined that the government's evidence was insufficient to establish that McCool and Frances were members of the conspiracy and that their statements thus were not admissible under Rule 801(d)(2)(E) as co-conspirator statements. The court concluded, however, that these statements were admissible under Rule 801(d)(2)(D) because McCool and Frances each qualified as Lundstrom's "agent or employee" and their statements were made on a matter within the scope of that agency or employment relationship.

Even assuming that the district court erred in admitting these statements, we conclude that the error was harmless. An evidentiary error is harmless if the record demonstrates that the defendant's substantial rights were unaffected and that the error "did not influence or had only a slight influence on the verdict." United States v. Lewis, 483 F.3d 871, 875 (8th Cir. 2007) (citation omitted). The "[i]mproper admission of evidence which is cumulative of matters shown by admissible evidence

is harmless error." Id. (citation omitted). The information set forth in McCool's emails was cumulative of and less damaging than that set forth in Furnas's spreadsheets. Likewise, any error in admitting Frances's two emails was harmless because Frances testified extensively at trial regarding the statements set forth therein, thereby "vitiat[ing] the main concern of the hearsay rule, which is the lack of any opportunity for the adversary to cross-examine [an] absent declarant." United States v. Renville, 779 F.2d 430, 440 (8th Cir. 1985).

### Hearsay - "Business Records"

Lundstrom next argues that the district court improperly admitted certain reports written by OTS employees as business records under Federal Rule of Evidence 803(6). He contends that reports prepared by government agencies do not qualify as business records under Rule 803(6) and that the OTS reports at issue here contained extraneous and unfairly prejudicial statements by OTS employees.

The district court ruled that the reports were admissible as business records, provided that the government satisfied the requirements of Rule 803(6).[5] The court further stated that Lundstrom's separate objection regarding the danger of unfair prejudice under Federal Rule of Evidence 403 "depend[ed] on the purposes for the offer and the contents of the OTS reports." The court gave Lundstrom "an opportunity to examine the reports and propose redactions," noting that it would rule on his contemporaneous objections during trial if the parties could not agree on redactions. Lundstrom did not renew his Rule 403 objections or raise any challenge to the redactions when these documents were discussed during testimony at trial.

---

[5]To be admissible under Rule 803(6), a document must have been prepared contemporaneously by an individual with knowledge and kept in the course of regularly conducted activity and as a regular practice, and the documents' custodian or another qualified individual must testify that these conditions were satisfied. The document will be admitted unless the opponent shows that the documents' source or method of preparation were untrustworthy.

Lundstrom asserts that the reports prepared by government agencies cannot be admitted as business records under Rule 803(6), given that the public records exception to the rule against hearsay—Rule 803(8)(A)(iii)—excludes "factual findings from a legally authorized" investigation when a report containing such findings is offered against a criminal defendant.

We have affirmed the admission of government reports under Rule 803(6) in criminal cases. In United States v. Williams, 720 F.3d 674, 698-99 (8th Cir. 2013), we concluded that law-enforcement fingerprint cards from a prior arrest were business records admissible under Rule 803(6) in a later drug-distribution and money-laundering prosecution. We reasoned that the fingerprint cards "were created as part of a routine booking procedure and not in anticipation of litigation, *i.e.*, 'for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial.'" Id. at 698 (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009)). Thus, the cards were admissible as business records "because they were created 'in the regular course of business'" and not "'solely for an evidentiary purpose.'" Id. at 699 (quoting Melendez-Diaz, 557 U.S. at 321-22, and Bullcoming v. New Mexico, 564 U.S. 647, 664 (2011)). In United States v. Voice, 622 F.3d 870, 879 (8th Cir. 2010), we held that the defendant's sex-offender registration document was admissible as a business record under Rule 803(6) in a SORNA prosecution because the registration was maintained by the state's division of criminal investigation in normal course of business and not in anticipation of litigation.

We conclude that the foregoing considerations likewise rendered admissible the OTS reports at issue here. OTS examiners supervise banks to ensure their soundness and compliance with financial laws and regulation; they do not conduct criminal investigations, collect evidence, or bring criminal charges. Accordingly, the OTS reports were admissible as business records under Rule 803(6) because the reports were created for the administration of the OTS's affairs and not for the purpose of establishing facts at trial.

-25-

Rule 803(8)(A)(iii) does not require the exclusion of the OTS Reports. Rule 803(8)(A)(iii) was intended to protect a criminal defendant's Confrontation Clause rights by ensuring that a police report could not be admitted unless its author testified. See United States v. Hayes, 861 F.3d 1225, 1229-31 (10th Cir. 1988). We believe that the rule should apply to reports prepared by law enforcement officials at the scene of a crime or in investigating a crime, and not to reports authored by other government agents regarding routine matters in nonadversarial settings. Even assuming that Rule 803(8)(A)(iii) applies here, however, the rule does not require the exclusion of the OTS reports because the authors testified and were subject to cross-examination. See United States v. Sokolow, 91 F.3d 396, 405 (3d Cir. 1996); United States v. King, 613 F.2d 670, 673-74 (7th Cir. 1980). In any event, any error in admitting the OTS reports was harmless, for the content of these reports was cumulative of other trial testimony and evidence.

**Jury Instructions**

Lundstrom next argues that the district court improperly instructed the jury. We review the district court's jury instructions for abuse of discretion, affirming if the instructions as a whole "fairly and adequately submitted the issues to the jury." United States v. Whitehill, 532 F.3d 746, 751 (8th Cir. 2008) (citation omitted).

Lundstrom first challenges the district court's willful-blindness instruction, which told the jury that it could find that Lundstrom "acted knowingly" if it found "beyond a reasonable doubt that [he] believed there was a high probability that his representations to regulators or the public were false or fraudulent, and that he took deliberate actions to avoid learning of that fact." A willful-blindness instruction is appropriate when "the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." Whitehill, 532 F.3d at 751 (citation omitted). "Ignorance is deliberate if the defendant[] w[as] presented with facts putting [him] on notice [that] criminal activity was particularly likely and yet intentionally failed to investigate." Id.; see also United States v. Novak, 866 F.3d

921, 927 (8th Cir. 2017) (affirming willful-blindness instruction and noting that "even if the jury believed [the defendant's] implausible" explanation, "there was sufficient evidence that he deliberately turned a blind eye to . . . clearly illicit activity to warrant" a willful-blindness instruction).

The evidence set forth in detail above established that Lundstrom was aware of the decline in the real estate market and the resulting effect that the decline had on the value of TierOne's loan and foreclosed-property portfolios. He attended problem-loan meetings, at which these portfolios were discussed, and he was forwarded McCool's emails, which set forth appraisal values and purchase offers below those carried on TierOne's books. Lundstrom was also presented with evidence that TierOne's regulatory reports did not disclose these losses or accurately calculate the bank's reserves. The OTS identified deficiencies in the bank's appraisal and reserve processes in its 2008 Report. Frances stated in two emails, both of which were forwarded to Lundstrom, that TierOne had not properly reported losses or allocated sufficient reserves. Furnas's spreadsheets—titled "Potential Reserve Additions Needed Due to Timing of New Appraisals"—estimated millions of dollars in unrecorded losses and understated reserves. Lundstrom also received an internal report for the second quarter of 2009, showing that TierOne had fallen $3.9 million short of its capital requirements and that its core capital ratio had slipped below 8.5%.

Although Lundstrom denied any knowledge of the plan to delay appraisals, defer recognition of losses, and understate reserves, he was presented with facts sufficient, at a minimum, to put him on notice that "criminal activity was particularly likely." Whitehill, 532 F.3d at 751. Lundstrom testified to his lack of knowledge, asserting that he relied on other TierOne executives and employees to manage the bank's appraisal processes, oversee the bank's loan and foreclosed-property portfolios, and ensure that the bank's financial statements were accurate. But the jury did not have to accept Lundstrom's explanations, particularly in light of the evidence that he undertook a "deliberate effort to avoid learning that TierOne's financial

-27-

reports were inaccurate." D. Ct. Order of Feb. 11, 2016, at 8. In light of the evidence of what could be fairly described as Lundstrom's almost frantic efforts to forestall the day of financial reckoning that he must have known was approaching, the district court did not abuse its discretion in issuing the willful-blindness jury instruction.

Lundstrom also challenges the district court's refusal to issue an advice-of-counsel jury instruction. Such an instruction may be appropriate if a defendant establishes that he "fully disclosed all material facts to his attorney before seeking advice" and that he "actually relied on his counsel's advice in the good faith belief that his conduct was legal." United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006).

Lundstrom testified in general that TierOne retained attorneys to assist with regulatory issues and to review the bank's press releases, that he consulted counsel before soliciting potential investors, that the Board's outside directors retained counsel to prepare an OTS-requested report evaluating Lundstrom's performance, and that the bank's investor-relations department consulted counsel when drafting Lundstrom's presentation for the 2009 shareholders meeting. This testimony does not establish that Lundstrom consulted an attorney regarding any of his conduct specific to the charges at issue, and even if it did, Lundstrom "is not immunized from criminal prosecution merely because he consulted an attorney in connection with a particular transaction." Id. at 896-97. Instead, he must show that he fully and accurately disclosed all material facts to counsel and that he actually relied on counsel's advice when making representations to regulators and shareholders. Lundstrom has failed to point to evidence in the record sufficient to satisfy these requirements, and so the district court properly declined to issue the requested instruction.

**Sentencing**

Lundstrom challenges his sentence, arguing that the district court committed procedural error in calculating the amount of loss attributable to his offense conduct

under § 2B1.1(b)(1) of the U.S. Sentencing Guidelines Manual (U.S.S.G. or Guidelines) and in applying the leadership enhancement under § 3B1.1(a) of the Guidelines. In determining whether a district court committed procedural sentencing error, "'we review [the] court's interpretation and application of the guidelines de novo and its factual findings for clear error.'" United States v. Jenkins, 578 F.3d 745, 749 (8th Cir. 2009) (citation omitted).

A district court's calculation of loss under § 2B1.1(b)(1) is a finding of fact that we review for clear error, "affording appropriate deference to the . . . court's determination based on its unique position to assess the evidence and estimate the loss." Id. The district court calculated the amount of loss attributable to Lundstrom's offense conduct to be $24.4 million, which resulted in a 20-level enhancement under § 2B1.1(b)(1) (instructing the court to increase base offense level by 20 if loss was more than $9.5 million but less than $25 million). Lundstrom contends that the district court should have used available "actual data" to calculate the loss and that the court's use of an "estimate methodology," namely, the modified recessionary method, resulted in a "grossly overstated" loss amount. He also contends that the court failed to account for losses caused not by the fraud scheme, but by the overall adverse market conditions during the period encompassing the fraud scheme.

"A district court's method of calculating loss 'must be reasonable, but the loss need not be determined with precision.'" United States v. Jokhoo, 806 F.3d 1137, 1140 (8th Cir. 2015) (citation omitted). For purposes of determining "the fraudulent . . . deflation in the value of a publicly traded" stock, the Guidelines state that a court "may use any method that is appropriate and practicable under the circumstances," including "a method under which the actual loss attributable to the change in value" of the stock is determined by "calculating the difference between the average price of the security . . . during the period that the fraud occurred and the average price of the security . . . during the 90-day period after the fraud was disclosed to the market." U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). The difference in average price is then multiplied

by the number of shares outstanding to arrive at an estimate of actual loss. Id. In determining whether the resulting sum is a reasonable estimate of actual loss, the court "may consider" whether that sum "includes significant changes in value not resulting from the offense," including "changes caused by external market forces." Id.

The district court employed the method described in the Guidelines. It first identified the fraud period as February 23, 2009, the date on which TierOne first issued fraudulent public statements that shareholders could have relied on in deciding to purchase TierOne shares, through November 10, 2009, the date on which TierOne filed a form with the SEC disclosing to the market its true financial state. The court then calculated the average price of TierOne stock during the fraud period ($2.29) and during the 90-day period immediately thereafter ($0.78). It multiplied the difference between those two figures ($1.51) by the average number of TierOne shares outstanding during the fraud period, excluding the number of shares owned by the conspirators, (16,183,181) to arrive at a $24.4-million loss amount.

Lundstrom argues that the district court erred by refusing to calculate the loss based on individual shareholder trading data. The court explained, however, that this data "[wa]s insufficient because it d[id] not account for shareholders who held stock during the fraud period in reliance on the fraud, and the evidence presented at trial clearly established that such shareholders existed and owned substantial holdings of TierOne stock." As the district court recognized, mathematical certainty is not required in loss calculation. Instead, "a reasonable estimate of the loss based on the available evidence will suffice." United States v. Wells, 127 F.3d 739, 748 (8th Cir. 1997). We conclude that the court did not clearly err in adopting the loss-calculation methodology set forth in the Guidelines.

Lundstrom also contends that the district court made no effort to distinguish between loss caused by the fraud scheme and loss caused by the adverse economic

and market conditions existing at that time. On the contrary, the district court considered the evidence offered by Lundstrom that detailed share prices of banks that he offered as comparators to TierOne, but concluded that the government's evidence was "more representative of the impact of general market forces on TierOne's share price." When parties present conflicting expert testimony, "[i]t is the province of the [factfinder] to decide which expert[] [was] more credible and persuasive." Stults v. Am. Pop Corn Co., 815 F.3d 409, 417 (8th Cir. 2016). We discern no clear error in the district court's methodology or in its ultimate determination of the loss attributable to Lundstrom's conduct. See United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007) ("The trial court must use a rational calculation method that yields a reliable estimate of the loss; however, the methodology does not have to be mathematically precise.").

Lundstrom also challenges the district court's application of a 4-level leadership enhancement under Guidelines § 3B1.1(a), arguing that he must have "directed or procured the aid of underlings" to be considered an organizer or leader for purposes of the enhancement. Under § 3B1.1(a), a defendant's offense level is increased by 4 if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

The record is sufficient to establish not only that Lundstrom directed or enlisted subordinates, but that the fraud was "otherwise extensive." Lundstrom directed and procured the aid of Laphen, Furnas, Langford, and Witkowicz to delay appraisals in order to avoid the recognition of losses and an increase in reserves. The fraud scheme was also "otherwise extensive" in light of the number of innocent participants unwittingly involved in the scheme, i.e., the Board secretary who filed minutes with the OTS, the loan officers who were unable to obtain updated appraisals, the outside accountants who relied on false information to certify financial reports for regulatory filings, and the bank employees who received Lundstrom's email encouraging them to inform customers that TierOne had met its regulatory

requirements.  See U.S.S.G. § 3B1.1 cmt. n.3 (noting that use of "the unknowing services of many outsiders" may render criminal activity "otherwise extensive"). The district court did not clearly err in applying the § 3B1.1 leadership enhancement.

Lundstrom also argues that his 132-month sentence is substantively unreasonable.  He contends that the district court failed to give the appropriate consideration to his age and to the nature and circumstances of his offense required by 18 U.S.C. § 3553(a).  "We review the substantive reasonableness of a sentence for abuse of discretion," keeping in mind the district court's "wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence."  United States v. Deering, 762 F.3d 783, 787 (8th Cir. 2014) (citation omitted).

The district court determined that Lundstrom's total offense level was 45, which, coupled with a Category I criminal history, resulted in a Guidelines sentencing range of life imprisonment.  Because the statutory maximum sentence applicable to Lundstrom's offense conduct was 360 months, however, the Guidelines range became 360 months. U.S.S.G. § 5G1.2(b).  The court heard argument from both parties regarding a downward variance, including a discussion of Lundstrom's age, health, and personal circumstances, as well as a discussion of general and specific deterrence and sentencing disparities.  The court then stated that it had "taken all of the [§] 3553(a) factors into consideration," including Lundstrom's "history and personal characteristics," his "age and . . . medical condition," and the "letters of reference from substantial members of [the] community."  The court then granted Lundstrom a 228-month downward variance before imposing concurrent sentences of 132 months on each count of conviction.

Where, as here, a district court varies below a properly calculated Guidelines sentence, it is "nearly inconceivable that the court abused its discretion in not varying downward still further."  Deering, 762 F.3d at 787 (citation omitted).  Having

reviewed the sentencing record and the district court's thorough explanation of the sentence imposed, we conclude that the court did not abuse its discretion or impose a substantively unreasonable sentence.

### Restitution

Finally, Lundstrom argues that the district court erred by not accounting for the effects of external market forces in its calculation of the $3,122,696 restitution award. "[W]e review a finding as to the amount of loss for clear error . . . ." United States v. Chalupnik, 514 F.3d 748, 752 (8th Cir. 2008).

Under the Mandatory Victims Restitution Act (MVRA), the district court "shall order" a defendant convicted of certain offenses to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1). "Restitution is compensatory, not punitive" and must be proved by a preponderance of the evidence. United States v. Chaika, 695 F.3d 741, 747-48 (8th Cir. 2012). "In a fraud case, [restitution] is limited to the actual loss 'directly caused by the defendant's criminal conduct in the course of the scheme alleged in the indictment.'" Id. (citation and emphasis omitted). The calculation of loss for sentencing purposes does not control the calculation of loss for restitution purposes. See id.

To establish the appropriate amount of restitution, the government presented evidence of claims data collected in a securities class action brought by TierOne shareholders against the bank's executives. That claims data identified the TierOne shares purchased during the February 23, 2009, through November 10, 2009, fraud period and sold after the public disclosure of the fraud, as well as the sum each shareholder lost per share. The government then offset the resulting loss calculation by a portion of the class-action settlement to arrive at a restitution amount of $3,122,696.

As he did before the district court, Lundstrom argues that this methodology fails to account for any external market forces that caused shareholder losses. The district court rejected this argument, finding that Lundstrom's fraud "did not cause shareholders to lose money by decreasing the value of TierOne's shares; it caused them to lose money by inducing them to purchase shares based on information that grossly overestimated the value of these shares." In other words, Lundstrom's fraud induced shareholders to purchase TierOne stock when they otherwise would not have. Two TierOne shareholders testified that they purchased shares after reviewing TierOne's financial reports, press releases, or annual meeting presentations, each of which conveyed the false impression that TierOne maintained a strong capital position. Where a defendant's fraudulent conduct enticed victims to enter the market in the first place, the defendant assumes responsibility for their losses, including those resulting from market forces. See, e.g., United States v. Robers, 698 F.3d 937, 944 (7th Cir. 2012) ("The declining [real estate] market only became an issue because of [the defendant's] fraud," and thus, the defendant, "not his victims, should bear the risk of market forces beyond his control."), *aff'd*, 134 S. Ct. 1854, 1859 (2014); United States v. Paul, 634 F.3d 668, 678 (2d Cir. 2011) ("The fact that independent market forces may have contributed to the decline in SLM stock held by [the victims] is irrelevant to the restitution calculation.").

The judgment is affirmed.

_____